## Richard P. HALVORSON *v.* Myles TROUT and Helen TROUT

75-43                                    527 S.W. 2d 573

### Opinion delivered July 7, 1975
[Rehearing denied September 8, 1975.]

*Harper, Young & Smith,* for appellant.

*Franklin Wilder,* for appellees.

CARLETON HARRIS, Chief Justice. Appellant, Richard P. Halvorson, instituted suit in the Sebastian County Chancery Court on August 24, 1973, against Myles and Helen Trout, appellees herein, for the sum of $15,000 which had been paid by appellant to appellees on July 31, 1973, Halvorson alleging that said sum should be returned to him and that appellees had refused to do so. The facts upon which the cause of action was based commenced in April or May of

1973, wherein appellant was attempting to purchase from the Trouts a meat packing business known as Border City Packing Company of Fort Smith. Appellees, who had been long-time owners of the concern, advertised in various newspapers and trade journals their desire to sell the business, and appellant, at that time a resident of Oklahoma City, saw an advertisement and responded, making a trip to Fort Smith to talk with the Trouts and view the operation. After negotiations back and forth, appellees agreed to sell the business for the sum of $236,700, a down payment to be made in the amount of $25,000. On July 31, 1973, Halvorson and his wife came to Fort Smith and met with the Trouts in the office of Robert Westphal, accountant for the Border City Packing Company. Halvorson had been unable to raise the entire $25,000 and informed the Trouts that he could only pay $15,000 at that time. It was agreed that the $15,000 would be accepted and Halvorson would be given thirty days in which to acquire the $10,000 balance. A document was typed setting out the obligations of the parties and interlineations were inserted by hand relative to matters that arose during the discussion. Mr. and Mrs. Halvorson and Mr. and Mrs. Trout all initialed the instrument.[1] The effective date is shown as August 1, 1973. At the same time, Halvorson gave his check in the amount of $15,000 to the Trouts with a notation "Earnest money on Agreement dated July 31, 1973 Contract to follow." Thereafter, Halvorson and his wife made a trip, and Halvorson apparently returned to Fort Smith on August 8. Events between that date and August 13 will be hereafter discussed, but on the 13th, Halvorson approached the Trouts, and according to his subsequent testimony, told them that he could not raise the additional $10,000 and accordingly wanted his $15,000 back. Mrs. Trout said that he simply came into the office and demanded his money back, which was refused. Thereafter, suit was instituted. On trial, the chancellor found that the agreement approved and initialed by the parties on July 31, 1973, constituted a binding and executed contract between the parties; that the check for $15,000 must be treated as designated on the face of the check as being "Earnest money", consideration for such contract, and that the prayer

---

[1]The record does not reflect who typed the document, but the testimony reflected that the written interlineations were written by Westphal.

for the return of the $15,000 should be denied. From the decree so entered, appellant brings this appeal. For reversal, three points are asserted which we proceed to discuss in the order listed.

"I.
*THE FINDING OF THE CHANCELLOR THAT THE JULY 31, 1973 AGREEMENT CONSTITUTED A BINDING CONTRACT WAS NOT BASED UPON THE PREPONDERANCE OF THE EVIDENCE AS SUBMITTED AT THE TRIAL."*

Only four persons testified, Mr. and Mrs. Halvorson and Mr. and Mrs. Trout. It is the contention of appellant that the agreement of July 31 did not constitute a contract of sale and the $15,000 should accordingly have been ordered returned. He said that at the meeting in Westphal's office, Mrs. Trout brought along the typed page setting out certain items involved but that there were other factors also involved, which were not included on this page. The witness stated that he did not agree to give a $25,000 down payment unless he was able to secure a loan for the additional $10,000; that various interlineations were written on the page by Robert Westphal, and that he (Halvorson) asked for assurance that there would be at least $12,600 in accounts receivable and inventory values and that Mrs. Trout responded there would be far more than that; however, this item was not mentioned on the written document. Mr. Halvorson said the inclusion of this item was essential because he would otherwise have no operating capital. His explanation for approving the effective date of the instrument (August 1, 1973) was that it was explained to him by Westphal that it was normal procedure to use the fiscal closing of the corporation as a turnover date. Mr. Halvorson stated that a prepared contract was presented to him on August 9 after he returned from vacation and was given to him by either Mrs. Trout or Westphal for a signature, but that he did not sign because he had been unable to secure the additional $10,000, and also because he found that there was no operating capital within the corporation; that the figures reflecting this fact became available about the middle of the afternoon on August 8. He said that he did not exercise any authority over employees of Border

City Packing Company after his return from vacation; that he was introduced to the employees of Border City as the new manager; that he did not consider himself as the owner of the company, though he did admit that he was given keys to the plant. He stated that he made one trip to the post office to get mail, and that he was taken to the stockyard by Mr. Trout and introduced to various commission companies. Halvorson said that he did not see the July 31 trial balance sheet until August 13 and a projection sheet that he had prepared was drawn up on the basis of past information.[2]

Mrs. Halvorson testified that the July 31 paper was just an agreement on some things that had been discussed, and that a contract was to be subsequently prepared; that this last discussion took place on the sidewalk outside of Mr. Westphal's office between her husband and the Trouts.

The difficulty with appellant's arguments is that most of his contentions involve questions of fact. The Trouts insisted that the agreement of July 31 was an agreement for Halvorson to purchase the business. Mrs. Trout said that Halvorson stated that he had come prepared to pay her $15,000 that day; that all parties went over the agreement; that certain changes were made at that time; that it was read and discussed by everybody before it was initialed; that after this was done, Mrs. Halvorson remarked to her that she knew Mrs. Trout was glad "this is over; this has been trying on you I know, but I want you to know one thing — that the Halvorsons will make a go of this business." Mrs. Trout testified that she introduced Halvorson to most of the employees herself as their new "boss" and not a "manager"; that she gave Halvorson her set of keys to "everything", which included the safe. This occurred, according to the witness, on August 9. She said that he worked in the office, figured tickets, waited on customers, was introduced to the customers and suppliers, and took in money. Mrs. Trout denied making any representations to Halvorson relative to accounts receivable or operating capital.

---

[2]Halvorson had earlier brought a friend with him to Fort Smith and they had gone over the books and records, after which Halvorson projected a first year budget for the business.

Mr. Trout testified that Halvorson was the "boss" of the business after July 31, and that he (Trout) took Halvorson over to the stockyards, introduced him to commission firms, attended auctions, explained how they were operated, and told the various commission firms that appellant was the new owner of Border City Packing Company.

As previously stated, it is apparent that the testimony is in conflict and, this being true, it was, of course, up to the chancellor to pass on the facts. Since he had the advantage of seeing and hearing these witnesses, we certainly cannot, from this record, say that Halvorson gave the correct version, and that the Trouts were prevaricating. Aside from that, however, there are certain facts which support the view of appellees. For instance, Mrs. Halvorson testified that as soon as the conversation in Westphal's office was over, and after the July 31 document was discussed, approved, and initialed, she went to Bridges Realty Company in Fort Smith and made an earnest money payment on a house[3] in the amount of $1,000.[4]

It is difficult to understand the Halvorsons' taking this action unless they considered that the business had been purchased.

The agreement itself seems to be rather thorough and is but little different from the proposed "contract of sale" (never executed), which was offered into evidence. A copy of the July 31 instrument is being placed in this opinion and a close comparison of the provisions therein and the provisions of the unexecuted contract definitely reflects that principal or major agreements, the "meat in the coconut" so to speak, are practically identical. A check of these provisions reveals that approximately 18 appearing in the July 31 paper appear likewise in the unexecuted "contract," and only one is not mentioned, and it is not of any great moment. The proposed "contract" appears to only reflect two provisions that are not mentioned in the July 31 instrument and one of these is clear-

---

[3] Mrs. Halvorson had accompanied her husband to Fort Smith on other occasions and had looked at houses.

[4] After it developed that Halvorson was not going to operate Border City Packing Company, the realty company returned this money to the Halvorsons.

ly an expansion, or explanation, of items in the first mentioned instrument.[5] The other term that is different provides that the Trouts retain an express lien on the property until all notes to the First National Bank are paid in full, while the July 31 provision was to the effect that the Trouts would hold a second mortgage on the property until all notes at the bank had been paid.[6] The price of the property, down payment, amount of monthly payments, length of payment period, provision for paying insurance and taxes, keeping the building in good repair, the employment of the Trouts, taking up the notes at First National Bank and having Mr. Trout's name removed from the note, and, as stated, a total of approximately 18 different items are set out definitely. Probably the most pertinent item is "effective date — August 1, 1973". This is the date also mentioned in the unexecuted contract. Appellant's strongest argument is that there is a notation written in the July 31 instrument, "Will be a contract of sale" and a notation on the check given by Halvorson, "Earnest money on agreement dated July 31, 1973 Contract to follow." Appellant says that at the most, the July 31 instrument was a contract to enter into a contract. Viewing the two instruments together, we cannot say the chancellor erred in his finding and it would appear that the purpose of having an attorney prepare a formal agreement was to have the agreement placed in "legal form" and that there was no real significance in this being done.[7] This seems logical because *both* instruments use the date of August 1, 1973 as the "effective date", i.e., the date of sale or transfer of the property. That it was purely a matter of preparing a formal instrument embracing the terms of the July 31 document, is also given credence by the fact that Halvorson left town immediately after approving that paper, and certainly would have had no

---

[5]"That $126,000 of this purchase price is in payment of the real estate to be conveyed by Helen Trout personally to second parties after this contract is paid in full, and pursuant to the Agreements herein stated, and that there is an additional amount of $18,700.00 due on the purchase price together with this $126,000.00, which is to draw 10% interest per annum over a 10 year period from date. ."

[6]Of course, the First National Bank had already made its loan to Border City and had either a mortgage or lien which, until the indebtedness due it was paid, would have been superior to any lien or mortgage of the Trouts.

[7]It is not shown who had this "contract of sale" prepared. The Trouts denied it, and Halvorson denied it, which would only leave Westphal.

opportunity to execute the formal contract of sale by August 1.

Of course, it would have been quite simple for appellant to have placed in the July 31 instrument a proviso that it was null and void if he were unable to obtain the additional $10,-000, ad it would have been just as simple to insert a stipulation or clause that there would be $12,600 in accounts receivable and inventory values.

Another fact should be mentioned. Mr. Westphal was not called to testify by either side, and it would certainly seem that this person, who was present during all the negotiations of July 31, would have been an important witness. Of course, Westphal could have been called by either side, but since appellant had the burden of proof, and it would appear that Westphal was the man who had the contract prepared, it would appear that appellant was the proper person to subpoena this witness. We hold that the instrument of July 31, 1973 was a valid and binding contract within itself.

"II.
*UNDER THE THEORY OF UNJUST ENRICHMENT APPELLANT WAS ENTITLED TO RETURN OF HIS $15,000.00*"

We cannot agree. Having held that the contract was legal and valid, it follows that the doctrine of unjust enrichment does not apply. In *Whitley* v. *Irwin*, 250 Ark. 543, 465 S.W.2d 906, we said:

> "The maxim or doctrine appellees rely upon is that no one shall be allowed to unjustly enrich himself at the expense of another. The word 'unjustly' as so used means 'unlawfully.' *** One is not unjustly enriched by receipt of that to which he is legally entitled. *** No recovery of money received can be based upon unjust enrichment when the recipient can show a legal or equitable ground for keeping it."

"III.
*THE CHANCELLOR IGNORED ACCEPTED AND*

ESTABLISHED EQUITY PRINCIPLES IN DENYING APPELLANT'S PRAYER FOR RECOVERY OF THE $15,-000.00 HE PAID TO APPELLEES UPON FAILURE OF THEIR NEGOTIATIONS."

Appellant argues that whether the July 31 "memorandum is construed as a contract or not," the situation presented by the evidence established that the $15,000 could only be characterized as a forfeiture; that the granting of relief from forfeitures and penalties is a function of courts of equity and 27 Am.Jur.2d, Equity, § 77, pages 599-600, is cited as follows:

"The principle is established that equity, by reason of its general jurisdiction over forfeitures and penalties, can grant relief from their consequences. Indeed, the granting of such relief has always been a special function of courts of equity. A forfeiture for breach of a covenant or condition in a contract is a recognized manner for the interposition and granting of relief by a court of equity. Equity relieves against forfeiture where no real fault is committed or where the breach is induced or waived by conduct, as well as where by accident or mistake there has been a breach of some collateral covenant, such as to repair or insure, and where a lessor may be placed in the same position as if the breach did not occur by an award of damages or otherwise."

It is argued that Mr. Halvorson did not have the ability to make the $10,000 payment and thus, should not be penalized. It is contended that there is no proof "except for general statements" that the Trouts suffered any damage as a result of appellant's failure to meet the terms of what they allege to be a binding contract, and that to allow them to keep the $15,000 defies equitable principles. It is true that no figure from which damages could definitely be ascertained was mentioned; however, damages suffered in this type of case ordinarily of necessity cannot be very definite. Mrs. Trout testified that she had advertised the business for sale for at least two months before Mr. Halvorson answered the advertisement, aad it appears that the parties negotiated back and forth on the price from the last of April until the last

of July, or a total of three months. The witness stated that she and her husband advertised extensively in different papers and magazines in California, Kansas, Missouri, Texas and Oklahoma, estimating that these advertisements had cost somewhere between $2,000 and $5,000. She said that another party named Baker had shown an interest in purchasing the property, and that she had been out a great deal of time in the negotiations with Halvorson. Mr. Trout could not pinpoint any losses but he felt that the business could have been affected by the sale, apparently meaning the sale to Halvorson and the return to Trout could have caused a loss of public confidence.

The conditions cited in 27 Am.Jur.2d, *supra*, do not appear applicable to the circumstances of this case, heretofore set out.

The court specifically mentioned payment of "earnest money" in its decree, and the check containing that notation appears to have been the primary reason for the finding that appellant was not entitled to return of this amount. Having found that the contract was complete on July 31, the finding concerning the earnest money was entirely proper, Bouvier's Law Dictionary (Third Revision), Volume 1, p. 965 mentions a generally accepted definition of earnest money as follows:

> "Specifically, in law, a part of the price of goods or service bargained for, which is paid at the time of the bargain to evidence the fact that the negotiation has ended in an actual contract. Hence it is said to bind the bargain."

The language in the Mississippi case of *Vanlandingham v. Jenkins*, 43 So. 2d 578, is enlightening as to the difference between a penalty and liquidated damages. The Supreme Court of Mississippi stated:

> "This brings us to a consideration of whether earnest money is a penalty or liquidated damages. As early as 1847, which is now more than 100 years ago, this Court set this question at rest, holding earnest money to be liquidated damages, and in its opinion the Court there said, in Sims v. Hutchins, 8 Smedes & M.

328, 47 Am. Dec. 90: 'The only grounds for such a recovery are the unwillingness or inability of the vendor to convey according to contract, or a mutual abandonment of the contract.' "

In the Illinois case of *Summers* v. *Hedenberg*, 198 Ill. App. 460, the court said:

"The contract shows that the purchaser parted with the earnest money for the benefit of the seller; that is, he paid it as a part of the purchase money. 'Said purchaser has paid $1,000 as earnest money, to be applied on such purchase when consummated.' It makes no difference whether the earnest money was delivered to the seller or by agreement is held by a third party. In case of defects in title which are not cured, at purchaser's option the contract becomes void and said earnest money should be returned. If the purchaser fails to perform, then at seller's option the earnest money should be retained by the vendor as liquidated damages."

It appears that earnest money is properly considered as liquidated damages and the trial court thus acted properly.

In concluding, considering the fact that the trial court personally heard these witnesses testify, together with other circumstances mentioned herein, we cannot say that the chancellor's findings were clearly against the preponderance of the evidence.

Affirmed.

JONES, J. dissents.

PLAINTIFF'S
EXHIBIT
NO. 1

**BORDER CITY PACKING COMPANY**
212-214 North 3rd Street • P.O. Box 1146
Fort Smith, Arkansas 72901

JULY 31, 1973

*Payment as follows:*
*Total    236,700.00*
*Assume. Notes*
*or    67,000.00*

SELL PLANT TO DICK HALVORSON FOR        236.700.00

*15,000 = Down Payment*
DICK HALVORSON GIVES $ 25,000.00  DOWN PAYMENT ON AMOUNT. *11,000 = Signing of Contract 25,000.00*
*10 Todays  Balance    144,700.00*
*@ 10%*

DICK HALVORSON TAKES UP 2 NOTES AT FIRST NATIONAL BANK. *and have Myles name taken off.*

DICK HALVORSON TAKES OUT IMMEDIATELY INSURANCE TO COVER BALANCE OF CONTRACT. *for 150,000*

DICK HALVORSON PAYS BALANCE OUT AT RATE OF 10 o/o  OVER  10 YEAR PERIOD. *Monthly Pymt*
(IF HE DECIDES TO PAY OFF BALANCE IT WILL BE AT 5% FOR REMAINDER OF TIME) *of 1912.29*

DICK HALVORSON CANNOT MISS 1 PAYMENT TO THE TROUTS.  IF HE DOES HE WILL HAVE LOST
   EVERYTHING HE HAS PUT INTO IT AND THE TROUTS WILL   TAKE BACK THE PLANT.
*First Payment due September 1 with 10 days grace period*
DICK HALVORSON WILL PAY ALL TAXES, INSURANCES AND ETC.  AND WILL KEEP THE BUILDING IN
GOOD REPAIRS AT ALL TIME. *Taxes & Insurance to be prorated*

THE PAPERS WILL ALL REMAIN WITH THE TROUTS UNTIL SUCH TIME THAT THAT MR. HALVORSON
   HAS PAID OFF ALL IN FULL. – *Contract of Sale*
*Business will continue as a going business.*
MR. AND MRS. TROUT WILL STAY WITH MR. HALVORSON FOR AS LONG AS WE AND HE FEELS THAT
HE CAN GO BY HIMSELF.( THIS WILL BE MORE OR LESS ON A STANDBY BASIS) FOR AT LEAST
120 DAYS OR MAYBE  5 MONTHS. *or to be negotiated*
AFTER THAT TIME WE WILL BE AVAILABLE  2 OR 3 DAYS A WEEK ., AT THE MOST.

MR. HALVORSON WILL STAY WITH, PROMOTE, AND DO EVERYTHING IN HIS POWER, TO MAKE THIS
BUSINESS GO.

ANY FEES WILL BE PAID BY THE COMPANY.

*Notes Payable to Trouts from Border City will be cancelled*
THE TROUTS WILL GIVE DICK HALVORSON, INVENTORY, ACCOUNTS REC., ALL FIXTURES BUT WILL
RETAIN A 2nd. MORTGAGE ON ALL UNTIL ALL NOTES AT THE BANK , (1ST. NATIONAL ) ARE PAID
IN FULL.

DICK HALVORSON WILL TAKE THE BUSINESS AS IT STANDS ON AUGUST 1, 1973 . WILL TAKE OVER
THE ACCOUNTS PAYABLE OR ANY OBLIGATIONS OF THE BORDER CITY PACKING , FOR THE AMOUNT
FIRST STATED. *Trouts state they knew of No major liabilities or contingencies Not*
*recorded on books.*
MR. HALVORSON WILL FURNISH THE TROUTS WITH A PROFIT AND LOSS STATEMENT BY THE
10th. OF EACH MONTH.

FURNISH ALSO A FININCIAL STATEMENT.

*RFH*

*Effective Date – August 1, 1973*

*Salary of Helen & Myles to remain the same*    *NBO*
                                                 *GH'd*
*Will be a contract of Sale*                     *M.J*
*Actually Two entities – Real Estate & Stock*
*Upon payment in full of '144,700 Trouts will transfer*
*free and clean Real Estate & 100% of Stock of Border City Packing Co*