**COLONIA INSURANCE COMPANY, a New York corporation, and Associated Insurance Management Corporation, a New York corporation, Plaintiffs,**

**v.**

**CITY NATIONAL BANK, Larry H. Putnam, Phillip Richmond, CC General Agency, Carolyn Jean Cooper, Donald Maurice Coleman, Marilyn J. Coleman, William R. Beason, Billy W. Beason, Michelle Thomas, Mark A. Thomas, Sharon Newsom, Betty I. Welch and Diana Welch, Defendants.**

No. Civ. 97–2115.

United States District Court, W.D. Arkansas, Fort Smith Division.

July 10, 1998.

Robert R. Cloar, Cloar & Kincannon, Fort Smith, AR, James E. Nesland, Richard P. Salgado, Cooley, Godward, LLP, Denver, CO, William J. Kelleher, Jr., New York City, for plaintiffs.

S. Walton Maurras, Smith, Maurras, Cohen & Redd, Fort Smith, AR, for City National Bank.

H. Ray Hodnett, Van Buren, AR, for Larry H. Putman.

Jerry D. Pruitt, Fort Smith, AR, for CC General Agency, Donald Maurice Coleman.

Robert L. Jones, III, Jones & Harper, Fort Smith, AR, for Midland Risk Ins.

## MEMORANDUM OPINION

H. FRANKLIN WATERS, Senior District Judge.

Currently before the court is defendant Donald Maurice Coleman's motion for summary judgment, CC General Agency's ("CC General") motion for summary judgment, and plaintiffs' responses thereto. Also before the court are CC General's motion for sanctions and plaintiffs' response thereto. The court believes that the factual and legal bases for these motions are similar and, thus, we will address all three motions in this opinion.

For the reasons set forth below, Coleman's motion for summary judgment is granted in part and denied in part, CC General's motion for summary judgment is denied, and CC General's motion for sanctions is denied.

## I. BACKGROUND

Arkansas General Agency, Inc. ("AGA"), and Delta General Agency, Inc. ("Delta"), were general insurance agencies. AGA was wholly owned by Rick Welch ("Welch"), and Delta was owned by Welch and two other individuals. On or about April 9, 1984, AGA entered into agency agreements with plaintiff Colonia Insurance Company ("CIC") to act as a general agent to write property and casualty insurance in Arkansas and Oklahoma. AGA also entered into agency agreements with other insurance companies. Thus, CIC was not the only insurer that AGA was representing.

AGA purchased Universal Insurance Company in 1988. CIC subsequently acquired Universal Insurance Company, and changed the name to Colonia Underwriters Insurance Company ("CUIC"). In March of 1989, AGA entered into an agency agreement with Universal Insurance Company to write non-standard automobile insurance. CUIC is not a party to the present litigation.

In September of 1990, Delta entered into similar agreements with CIC to write insurance in Tennessee and Mississippi. Pursuant to their contracts with CIC, AGA and Delta were required to collect insurance premiums from policyholders, hold the funds in trust for plaintiffs, and remit the premi-

ums, less their commissions, to plaintiffs when they came due. Plaintiff Associated Insurance Management Corporation is a management company that entered into an agreement with CIC and CUIC to compute, collect, and deposit the insurance premiums that were originally collected and held by AGA and Delta. Claus Dannasch is the President of CIC, CUIC and AIM. Both CIC and AIM are owned by Colonia Holdings, Inc.

AGA's agreements with CIC contained the following provision regarding premium collection and remittance:

> All premiums received by Agent shall be held by him in trust for the Company as Trustee, until delivered to it, and the privilege of retaining commissions out of such premiums, the keeping of an account with Agent on Company's books, as Creditor and debtor account, alteration in compensation rate, failure to enforce prompt remittance, compromise, settlement, declaration of balance due, shall not change nor be held to waive assertion of such trust relationship.

*Exhibit "5A" attached to Appendix to Plaintiffs' Response in Opposition of Coleman's Motion for Summary Judgment,* at 2. AGA's agreement with CUIC contained a similar provision. In CUIC's agreement, however, AGA specifically agreed to establish a trust account to effectuate the terms of the agreement.

In addition, with respect to the book of business,[1] the agency agreements stated that:

> In the event of termination of this Agreement, the Agent having promptly accounted for and paid over premiums for which he may be liable, the Agent's records, use and control of expirations shall remain the

property of the Agent and be left in his undisputed possession; otherwise the records, use and control of expirations shall be vested in the Company.

*Id.,* at 4.

Throughout the relevant time period, AGA maintained at least four accounts at City National Bank ("CNB"). None of the accounts were labeled as trust accounts or contained any restriction on withdrawals. Plaintiffs were not designated as having any interest, legal or equitable, in the accounts.

In 1989, Jim Sternberg, plaintiffs' treasurer and vice president, began allowing Welch and AGA to make untimely premium payments to CIC. Sternberg knew that Welch was using the premiums he collected to pay the general operating expenses of AGA, and thus, was unable to make the payments when they came due. This pattern of delinquency continued, and Sternberg concealed it from other officials of plaintiffs until October of 1994, when Sternberg told Dannasch about AGA's overdue accounts. At that point, AGA was in arrears of approximately $1.2 million.

On November 28, 1994, plaintiffs brought an action against Welch and AGA in the United States District Court for the Western District of Arkansas, Fort Smith Division, alleging that defendants had committed civil conspiracy, fraud, deceit, conversion, breach of fiduciary duty, and breach of contract by misappropriating at least $3.4 million of the premiums collected by AGA, Delta, and Ashland General Agency ("Ashland").[2] *See, Associated Ins. Mgmt. Corp. v. Arkansas Gen. Agency, Inc.,* Civ. No. 94–2223. On February 7, 1996, following a jury trial resulting in a unanimous verdict for plaintiffs, judgments in the approximate amount of $3.4 million in compensatory damages and $1.8 million in

---

1. The term "book of business" is commonly known in the insurance industry as "expirations." *See John Bezdek Ins. Assocs., Inc. v. American Indemnity Co.,* 834 S.W.2d 401, 404 (Tex.App.—San Antonio 1992) (citation omitted).
'Expirations' is a term with definite and well-recognized meaning in the insurance field. It embodies the records of an insurance agency by which the agent has available a copy of the policy issued to the insured or records containing the date of the insurance policy, the name of the insured, the date of its expiration, the amount of insurance, premiums, property cov-

ered and terms of insurance. * * * It has been determined that this information is of vital assistance to the agency in carrying on the insurance business and it has become, in the insurance field, recognized as a valuable asset in the nature of good will.
*Fred Miller Co. v. Empire Fire & Marine Ins. Co.,* 503 F.2d 751, 752 n. 1 (8th Cir.1974).

2. According to the amended complaint, Ashland is another insurance company owned by Welch that was also found to have converted the plaintiffs' insurance premiums.

punitive damages were entered against Welch and AGA.[3] Both Welch and AGA are named as co-conspirators in the present action but not as defendants.

Subsequent to the suit against Welch and AGA in Arkansas, plaintiffs brought a similar action against Delta in the United States District Court for the Western District of Tennessee alleging that Delta participated in the same misappropriation of insurance premiums that gave rise to the Arkansas suit. *See, Associated Ins. Mgmt., Inc. v. Delta Gen. Agency, Inc.*, Civ. No. 95–2614–GV. On May 13, 1997, a judgment in the amount of $813,556 was entered in favor of plaintiffs against Delta based on claims identical to those for which Welch and AGA were held liable in Arkansas. As with Welch and AGA, Delta is named only as a co-conspirator in the case at hand.

Plaintiffs presently allege that over the course of the AGA action, the Delta action, and the bankruptcy proceedings subsequently commenced by Welch and AGA, plaintiffs learned that the defendants conspired with and aided and abetted Welch, AGA and Delta to defraud plaintiffs and misappropriate from them the $3.4 million of insurance premiums that were the subject of the previous suits. Plaintiffs also allege that each of the defendants are independently liable on a variety of claims related to these premiums, including: interference with a contractual relationship, conversion, negligence, breach of fiduciary duty, fraudulent concealment, and unjust enrichment.

It is undisputed that Welch and AGA misappropriated $3.4 million of plaintiffs' premiums by commingling the premiums with other deposits in AGA's accounts at CNB, and then using the funds in those accounts to pay for the general operating expenses of AGA and the personal expenses of Welch and others. The two key issues currently before the court are: (1) whether Coleman aided and abetted Welch and AGA's fraud and (2) whether Coleman and/or CC General intentionally interfered with AGA and plaintiffs' contractual relationship.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate only when there is no genuine issue of material fact, so that the dispute may be decided on purely legal grounds. *Holloway v. Lockhart*, 813 F.2d 874, 878 (8th Cir.1987); Fed. R.Civ.P. 56(c). The Supreme Court has issued the following guidelines for trial courts to determine whether this standard has been satisfied.

> The inquiry performed is the threshold inquiry of determining whether there is a need for trial—whether, in other words, there are genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). *See also AgriStor Leasing v. Farrow*, 826 F.2d 732, 734 (8th Cir.1987); *Niagara of Wisconsin Paper Corp. v. Paper Industry Union—Management Pension Fund*, 800 F.2d 742, 746 (8th Cir.1986).

The Eighth Circuit Court of Appeals has advised trial courts that summary judgments should be cautiously invoked so that no person will be improperly deprived of a trial of disputed factual issues. *Inland Oil & Transport Co. v. U.S.*, 600 F.2d 725, 727 (8th Cir.1979). In *Counts v. M.K.–Ferguson Co.*, 862 F.2d 1338 (8th Cir.1988), the court, reviewing the burdens of the respective parties, stated:

> [T]he burden on the party moving for summary judgment is only to demonstrate, *i.e.*, "[to] point[ ] out to the District Court," that the record does not disclose a genuine dispute on a material fact. It is enough for the movant to bring up the fact that the record does not contain such an issue and to identify that part of the record which bears out his assertion. Once this is

---

**3.** The court learned, after this opinion was written, that the Eighth Circuit Court of Appeals was going to reverse the district court and remand for vacation of the judgment entered against Welch and AGA for lack of subject matter jurisdiction. *See Associated Ins. Mgmt. Corp., et al. v.*

*Welch, et al.*, 149 F.3d 794. The Eighth Circuit's decision is not final, however, as no mandate has been issued. Therefore, we are entering this opinion and will subsequently revisit any of the issues addressed herein if necessary.

done, his burden is discharged, and, if the record in fact bears out the claim that no genuine dispute exists on any material fact, it is then the respondent's burden to set forth affirmative evidence, specific facts, showing that there is a genuine dispute on that issue. If the respondent fails to carry that burden, summary judgment should be granted.

*Id.,* at 1339 (*quoting City of Mt. Pleasant, Iowa v. Associated Elec. Coop., Inc.,* 838 F.2d 268, 273–74 (8th Cir.1988) (citations omitted) (brackets in original)).

However, the Court of Appeals for this circuit has also held that the court, in ruling on the motion for summary judgment, must give the non-moving party "the benefit of all the reasonable inferences that can be drawn from the underlying facts." *Fischer v. NWA, Inc.,* 883 F.2d 594, 598–99 (8th Cir. 1989) (*citing Trnka v. Elanco Products Co.,* 709 F.2d 1223, 1225 (8th Cir.1983)).

## III.  DISCUSSION

### A.  Plaintiffs' Claims Against Coleman

#### 1.  Civil Conspiracy

Plaintiffs contend that Coleman is liable for aiding and abetting Welch and AGA's fraud. Plaintiffs assert that Coleman knew Welch was depositing plaintiffs' insurance premiums into AGA's general operating accounts at CNB, commingling plaintiffs' premiums in those accounts with other deposits, and using the premiums to pay the operating expenses of AGA and the personal expenses of Welch and others. Plaintiffs further assert that Coleman knew that Welch's actions were in violation of AGA's agency agreements with plaintiffs.

Plaintiffs contend that Coleman aided and abetted Welch and AGA in the misappropriation of plaintiffs' premiums, and, in return, he received thousands of dollars of plaintiffs' premiums in the form of bonuses and gifts from Welch and AGA. In addition, plaintiffs contend that Coleman "was personally responsible for funneling to Rick Welch and others, funds constituting Plaintiffs' commingled premiums." *Plaintiffs' Brief,* at 2.

Plaintiffs contend that Coleman is liable for civil conspiracy, negligence, fraud, breach of fiduciary duty, aiding and abetting fraud and aiding and abetting breach of fiduciary

duty. We start by examining plaintiffs' claim for civil conspiracy.

Civil conspiracy has been defined in Arkansas as "a combination of two or more persons to accomplish a purpose that is unlawful, or oppressive, or to accomplish some purpose, not in itself unlawful, by unlawful, oppressive, or immoral means." *Chalmers v. Toyota Motor Sales, USA, Inc.,* 326 Ark. 895, 905–06, 935 S.W.2d 258, 264 (1996). However, civil conspiracy is not regarded as a separate tort in itself. *See* W. Page Keeton, *et al., Prosser and Keeton on the Law of Torts* § 46 at 324 (5th ed.1984) (footnote omitted). "The gist of the action is not the conspiracy charged, but the tort working damage to the plaintiff. It is only where means are employed, or purposes are accomplished, which are themselves tortious, that the conspirators who have not acted but have promoted the act will be held liable." *Id.* (footnotes and citations omitted).

The Restatement (Second) of Torts § 876 states that "[f]or harm resulting to a third person from the tortious conduct of another, one is subject to liability if he ... (b) knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other...." *Restatement (Second) Torts* § 876 (1979). Plaintiffs contend that Coleman assisted Welch and AGA in their tortious conduct and, thus, he is liable for the full extent of the harm caused.

The comments to § 876(b) state that "[a]dvice or encouragement to act operates as a moral support to a tortfeasor and if the act encouraged is known to be tortious it has the same effect upon the liability of the adviser as participation or physical assistance." *Id.,* at cmt. d. Furthermore, "[i]f the encouragement or assistance is a substantial factor in causing the resulting tort, the one giving it is himself a tortfeasor and is responsible for the consequences of the other's act." *Id.* The comments make it clear that a defendant who "knowingly gives substantial aid to another who, as he knows, intends to do a tortious act" is liable for the damage caused by the other's act. *Id.*

Liability under § 876(b) does not attach, however, if the assistance of or participation by the defendant is so slight that he cannot

be held liable for the act of the other. *Id.* "In determining this, the nature of the act encouraged, the amount of assistance given by the defendant, his presence or absence at the time of the tort, his relation to the other and his state of mind are all considered." *Id.*

The Eighth Circuit has required plaintiffs to prove the following elements in order for secondary liability to attach under § 876(b): "(1) the primary actor must commit a wrongful act that causes injury; (2) the aider and abettor must be generally aware of his role in the overall wrongful activity at the time assistance is provided; and (3) the aider and abettor must knowingly and substantially assist the wrongful act." *In re Temporomandibular Joint (TMJ) Implants Products Liability Litig.,* 113 F.3d 1484, 1495 (8th Cir. 1997). In addition, the alleged substantial assistance must be the proximate cause of the plaintiffs' harm. *Id. See also Cobb v. Indian Springs, Inc.,* 258 Ark. 9, 16–19, 522 S.W.2d 383, 387–89 (1975).

■■■ Under Arkansas law, the general rule is that "[a]ll who actively participate in any manner in the commission of a tort, or who command, direct, advise, encourage, aid or abet its commission, are jointly and severally liable therefor." *Hinton v. Bryant,* 236 Ark. 577, 582, 367 S.W.2d 442, 444 (1963) (citation omitted). Thus, the key issue in this case is whether Coleman actively participated in Welch and AGA's tortious conduct, *i.e.,* whether Coleman commanded, directed, advised, encouraged and/or aided and abetted the torts committed by Welch and AGA. We now review the evidence before us regarding Coleman's participation in the fraud to determine whether a genuine issue of material fact exists as to whether Coleman substantially assisted Welch and AGA in their fraud.

Coleman was hired in 1982 by Welch to be in charge of underwriting for AGA, and he was also named as AGA's vice-president. In addition, there is evidence that Coleman served on the Board of Directors of AGA. *See Exhibit "3" attached to Appendix to Plaintiffs' Response in Opposition to Coleman's Motion for Summary Judgment.*

As an officer of AGA, Coleman had signature authority to conduct all business and related activities of AGA, including the borrowing of money and the execution of documents necessary thereto. Coleman had signature authority to sign on behalf of AGA's general operating account and AGA's adjuster's account. Coleman stated in his deposition that he was authorized to sign on basically any account that AGA had. *See Exhibit "7" attached to Appendix to Plaintiffs' Response in Opposition to Coleman's Motion for Summary Judgment,* at 23.

Plaintiffs assert that Coleman had the power to open and close accounts, make deposits and withdrawals, and review all account records. Coleman admits that he signed checks on AGA's operating account when Welch was out of town or ill, but he maintains that he had nothing to do with the accounting relating to AGA's accounts at CNB and that he did not make deposits into those accounts. He asserts that he did not deal with the collecting and remitting of premiums. He contends that Larry Putman, the in-house accountant, dealt with premium collection, deposits and remittances. Plaintiffs assert, however, that Coleman personally wrote checks out of AGA's operating account to others, including Welch. Plaintiffs contend that Coleman was assisting Welch in funneling plaintiffs' premiums out of AGA.

Welch stated in his deposition that Coleman "pretty much ran the company in [his] absence" and that Coleman was in charge of rates, rules, regulations and underwriting guides. *Exhibit "5" attached to Appendix to Plaintiffs' Response in Opposition to Coleman's Motion for Summary Judgment,* at 119. Welch referred to Coleman as his "right-hand man." As evidence that Coleman was aware of the terms of the agency agreements between plaintiffs and AGA, plaintiffs point to the fact that Coleman attested the agency agreements between AGA and plaintiffs.

Jim Sternberg stated at his deposition that he also viewed Coleman as Welch's right-hand man, and when Welch was out of town or ill, he went to Coleman to discuss business issues. *Coleman's Exhibit "A,"* at 120. He asserted that he talked to Coleman about underwriting and personal matters, but not about "financial matters." *Id.* In fact, he stated that he never discussed the issue of premium collections and remittances with Coleman. *Id.,* at 123. When asked whether

Coleman knew that Welch was delaying AGA's premium payments to plaintiffs, Sternberg responded "[n]ot to my knowledge." *Id.,* at 129–30. Sternberg stated that to his knowledge, Larry Putman was the only other person at AGA that knew Welch was not paying his premium payments in full.

In addition to Coleman's professional relationship with Welch, he maintained a friendship with his business partner.[4] Plaintiffs assert that as a reward for participating in Welch's fraudulent scheme, Coleman was given thousands of dollars in bonuses and gifts from his friend. Specifically, plaintiffs assert that AGA gave Coleman $100,000 to help Coleman build himself a house. Plaintiffs cite a letter from Welch to Jim Miller, a loan officer at CNB, in which Welch explained why AGA needed a loan from CNB. Welch stated in his letter that AGA's cash outlays had left their cash flow depleted, and he cited as one example a $100,000 cash outlay to Coleman for his house. *See Exhibit "15" attached to Appendix to Plaintiffs' Response in Opposition to Coleman's Motion for Summary Judgment.* In the previous lawsuit against AGA, Coleman testified that Welch gave him approximately $100,000 to use towards the building of his home. *See Coleman's Exhibit "D,"* at 903.

In Coleman's deposition taken on August 25, 1997, given in connection with the bankruptcy of AGA, Coleman denied receiving $100,000 from Welch or AGA to help him build his house. *See Exhibit "7" attached to Appendix to Plaintiffs' Response in Opposition to Coleman's Motion for Summary Judgment,* at 33–35. Furthermore, in his reply brief he contends that none of the funding for his house came "directly from AGA," but were commission payments earned by Coleman and wired directly into his bank account. *Coleman's Reply Brief,* at 5–6. Plaintiffs contend that Coleman's inconsistent statements in connection with this $100,000 gift puts Coleman's credibility at issue.

In addition, during the period of 1990 through 1995, plaintiffs assert that Coleman received a total of $391,860.48 from AGA and Delta. *See Exhibit "11" attached to Appendix to Plaintiffs' Response in Opposition to Coleman's Motion for Summary Judgment,* at 7. That amount represents $278,294.62 in salary and bonuses from AGA paid out of AGA's accounts at CNB; $71,801.76 in forgiven advances from AGA paid out of AGA's accounts at CNB; $7,800 in salary and bonuses from Delta; and $33,964.10 in gifts. *Id.* Only the salary and bonus payments were included on Coleman's W–2 Wage and Tax Statements and, thus, he only reported those amounts as income. *Id.,* at 4–5. Coleman testified in the previous lawsuit against AGA that he received thousands of dollars from AGA that represented "gifts" and that were not included as income on his individual tax returns. *See Exhibit "16" attached to Appendix to Plaintiffs' Response in Opposition to Coleman's Motion for Summary Judgment,* at 905–07. Welch has stated that Coleman received these bonuses and gifts in return for his hard work and dedicated service to AGA.

Coleman asserts that he cannot be held liable for conversion with respect to the amounts he received prior to 1992 because Jim Sternberg stated in his deposition that AGA did not owe plaintiffs any premiums at the end of 1991. In addition, Coleman asserts that his house was finished in 1992, and, as such, any gift from Welch or AGA in 1991 for his house could not have been from plaintiffs' premiums. We note, however, that Jim Sternberg admitted that he began allowing Welch to delay premium payments in 1989.

After a careful review of the record before us, we conclude that a genuine issue of material fact exists as to whether Coleman substantially participated in Welch and AGA's tortious conduct. Coleman, unlike Sharon Newsom,[5] was more than just an employee at

---

**4.** In Rick Welch's deposition, he referred to Coleman as a friend and a partner. *See Exhibit "5" attached to Appendix to Plaintiffs' Response in Opposition to Coleman's Motion for Summary Judgment,* at 181.

**5.** Newsom was employed by AGA for approximately twelve years as a claims supervisor.

Plaintiffs attempted to cast liability onto Newsom merely by her employment at AGA. We found plaintiffs' claims totally lacking in merit and held in a memorandum opinion filed December 9, 1997, that there was no evidence that Newsom had any knowledge of Welch and AGA's scheme to defraud plaintiffs.

AGA. He was vice-president and Welch's "right-hand man." In addition, he had signature authority over AGA's operating account, and, on at least two occasions, he signed checks made payable to Welch. He undoubtedly understood the arrangement between AGA and plaintiffs regarding premium collection and remittances. Furthermore, although all of the employees at AGA received bonuses at one time or the other, Coleman's bonuses were unusually large. The large bonuses, in combination with Coleman's relationship with Welch and AGA, raise an issue of material fact as to whether Coleman was assisting Welch in misappropriating plaintiffs' premiums.

We note that plaintiffs' have not put forward any direct evidence that an agreement to defraud plaintiffs existed between Welch and Coleman, and, in addition, plaintiffs have not demonstrated how Coleman aided and abetted Welch and AGA's fraud. In other words, plaintiffs have not shown what assistance Coleman gave to Welch other than through his position as vice-president and the fact that he signed some checks on AGA's operating account. Under Arkansas law, "[a] conspiracy may be shown by direct evidence of an actual agreement or understanding between conspirators, but it may also be shown by circumstantial evidence." *Mason v. Funderburk,* 247 Ark. 521, 529, 446 S.W.2d 543, 548 (1969). In addition, an agreement may be inferred "from actions of alleged conspirators, if it be shown that they pursued the same unlawful object, each doing a part, so that their acts, although apparently independent, are in fact connected and cooperative, indicating a closeness of personal association and a concurrence of sentiment." *Id.* We find that because Coleman was vice-president of AGA, Welch's "right-hand man," business partner and friend, and because Coleman received such large bonuses from Welch and AGA, a reasonable person could infer that Coleman was cooperating with Welch in his scheme to defraud plaintiffs and that his cooperation and/or participation was a proximate cause of plaintiffs' damages.

Coleman contends that plaintiffs' claims against him are barred by the intracorporate conspiracy doctrine. The general rule is that a corporation cannot conspire with itself through its agents. *See Larson by Larson v. Miller,* 76 F.3d 1446, 1456 n. 6 (8th Cir.1996). However, there is an exception to the general rule. "When the interests of principal and agents diverge, and the agents at the time of the conspiracy are acting beyond the scope of their authority or for their own benefit rather than that of the principal" the agent is legally capable of conspiring with the corporate principal. *Pink Supply Corp. v. Hiebert, Inc.,* 788 F.2d 1313, 1317 (8th Cir.1986). *See also Ripplemeyer v. Nat'l Grape Co-op. Ass'n, Inc.,* 807 F.Supp. 1439 (W.D.Ark.1992).

As to the conspiracy to breach a fiduciary duty claim, Coleman asserts that because he did not owe plaintiffs a fiduciary duty, he cannot be held liable for Welch's breach. The Arkansas Supreme Court has held that "one who knowingly aids, encourages or cooperates with a fiduciary in the breach of his duty becomes equally liable with such fiduciary." *Raines v. Toney,* 228 Ark. 1170, 1182, 313 S.W.2d 802, 810 (1958). Thus, we believe that a genuine issue of material fact exists as to whether Coleman aided and abetted Welch, or conspired with Welch to commit fraud, conversion, breach of fiduciary duty, and/or negligence. We also believe that a genuine issue of material fact exists as to whether Coleman personally misappropriated and/or converted plaintiffs' premiums. Therefore, Coleman is not entitled to summary judgment on plaintiffs' claims.

### 2. Constructive Trust [6]

We held in our memorandum opinion filed June 11, 1998, that plaintiffs were barred from tracing the trust property into CNB's hands as plaintiffs have already obtained a money judgment against Welch and AGA for the trust property. We concluded that plaintiffs have elected their remedy by pursuing and obtaining a judgment against Welch and AGA in the previous lawsuit.

---

6. Coleman asserts that plaintiffs' claim for constructive trust is barred by res judicata and claim preclusion. Because the court holds that the

claim is barred under the theory of election of remedies, we do not address plaintiffs' alternative arguments.

Thus, plaintiffs may pursue this lawsuit against the defendants for their participation in the misappropriation of plaintiffs' premiums, but they may not seek to impose a constructive trust against them for the $3.4 million. Therefore, based on the reasons set forth in our memorandum opinion filed June 11, 1998, Coleman is entitled to motion for summary judgment on plaintiffs' claim for constructive trust.

### 3. Unjust Enrichment

■ Plaintiffs allege in the amended complaint that Coleman has been unjustly enriched by all amounts he received from Welch and AGA. "To find unjust enrichment, a party must have received something of value, to which he was not entitled and which he must restore." *Coleman's Serv. Ctr., Inc. v. F.D.I.C.*, 55 Ark.App. 275, 299, 935 S.W.2d 289, 302 (1996) (*citing Dews v. Halliburton Indus., Inc.*, 288 Ark. 532, 536, 708 S.W.2d 67, 69 (1986)). "However, there must be some operative act, intent, or situation to make the enrichment unjust and compensable." *Sparks Regional Medical Ctr. v. Blatt*, 55 Ark.App. 311, 317, 935 S.W.2d 304, 306 (1996) (citation omitted). "One who is free from fault cannot be held to be unjustly enriched merely because he has chosen to exercise a legal or contract right." *Id.* (citation omitted).

■ Arkansas law is clear on the issue that in the realm of unjust enrichment, the word "unjust" means "unlawful." "One is not unjustly enriched by receipt of that to which he is legally entitled. * * * No recovery of money received can be based upon unjust enrichment when the recipient can show a legal or equitable ground for keeping it." *Halvorson v. Trout*, 258 Ark. 397, 403, 527 S.W.2d 573, 577 (1975) (*quoting Whitley v. Irwin*, 250 Ark. 543, 550–51, 465 S.W.2d 906, 910–11 (1971)). *See also, Jackson County Grain Drying Coop. v. Newport Wholesale Electric, Inc.*, 9 Ark.App. 41, 46, 652 S.W.2d 638, 640 (1983) (no one shall be allowed to unjustly enrich himself at the expense of another; the word "unjustly" means "unlawfully").

Coleman contends that because he was an employee of AGA, he was entitled to the money he received as remuneration for his services, and, as such, he was not unjustly

enriched. The court believes that, based on the reasons set forth above, a genuine issue of material fact exists as to whether Coleman knew that the source of the money he received from Welch and AGA, especially the bonuses and gifts, was plaintiffs' premiums. Therefore, Coleman is not entitled to summary judgment on plaintiffs' unjust enrichment claim.

### 4. Three Year Statute of Limitations/Laches

■ Under Arkansas law, a cause of action for fraud is governed by a three-year statute of limitations. Ark.Code Ann. § 16–56–105 (1987). In *Dupree v. Twin City Bank*, 300 Ark. 188, 191–92, 777 S.W.2d 856, 858 (1989), the court stated:

> As to fraud or misrepresentation, mere ignorance of one's rights does not prevent the running of the statute of limitations or laches, unless such ignorance is due to fraudulent concealment or misrepresentation on the part of those invoking the benefit of the statute. While an action for fraud must be brought within three years from the date the cause of action accrues, the fraud does suspend the running of the statute of limitations and the suspension remains in effect until the party having the cause of action discovered the fraud or should have discovered it by the exercise of reasonable diligence.

(citations omitted).

"[T]he test for the statute of limitations for fraud is not a subjective one, i.e. when the fraud was discovered or *should have been discovered....*" *Id.* at 192 n. 2, 777 S.W.2d at 859. The question that arises is whether the plaintiff used due diligence. *Talbot v. Jansen*, 294 Ark. 537, 744 S.W.2d 723 (1988). The burden is on the plaintiff to exercise due diligence to discover the fraud if apprised of facts which should place the plaintiff on notice. "Affirmative action on the part of the person charged with fraud to conceal a plaintiff's cause of action will toll the running of the statute of limitations." *Hughes v. McCann*, 13 Ark.App. 28, 31, 678 S.W.2d 784, 786 (1984).

In *J.W. Reynolds Lumber Co. v. Smackover State Bank*, 310 Ark. 342, 349, 836

S.W.2d 853, 856 (1992), the court stated that "[l]aches is based on the theory that it is the unreasonable delay of the party seeking relief under such circumstances as to make it inequitable or unjust for the party to seek relief now." *Id.*, 310 Ark. at 349, 836 S.W.2d 853, (citation omitted).

We held in our memorandum opinion filed June 11, 1998, that a genuine issue of material fact exists as to when plaintiffs discovered the fraud and whether they used due diligence to detect it. Therefore, Coleman is not entitled to summary judgment on the basis of the statute of limitations or laches.

### 5. Equitable Estoppel

■ Coleman asserts that plaintiffs should be equitably estopped from claiming that he owes plaintiffs the monies that he received from Welch and AGA. Specifically, Coleman contends that because Jim Sternberg concealed the fact that AGA owed premiums, and plaintiffs failed to use due diligence to detect such concealment, plaintiffs should be estopped from coming after the premiums from Coleman. As we have stated throughout this opinion, a genuine issue of material fact exists as to Coleman's knowledge of the fraud and as to whether plaintiffs exercised due diligence to detect it. Therefore, Coleman is not entitled to summary judgment on the theory of equitable estoppel.

### B. Plaintiffs' Claims Against Coleman & CC General

■ Plaintiffs assert that Coleman and CC General interfered with their agency relationship with AGA by aiding and abetting the transfer of AGA's book of business to Midland Risk Insurance Company ("MRIC"). Both Coleman and CC General move for summary judgment on plaintiffs' claim for contractual interference.

■ Arkansas recognizes the intentional tort of improper interference with another's contract with a third person without legal justification. *See Walt Bennett Ford, Inc. v. Pulaski County Special School Dist.*, 274 Ark. 208, 213, 624 S.W.2d 426, 429 (1981). The elements required to prove the tort are: "(1) the existence of a valid contractual relationship or business expectancy; (2) knowledge of the relationship or expectancy on the

part of the interferor; (3) intentional interference inducing or causing a breach or termination of the relationship or expectancy; and (4) resultant damage to the party whose relationship or expectancy has been disrupted." *Id.*, 274 Ark. at 214, 624 S.W.2d at 429 (citation omitted). In addition, it appears that the Arkansas Supreme Court requires that the conduct of the defendant be at least improper. *See Mason v. Wal–Mart Stores, Inc.*, 333 Ark. 3, 969 S.W.2d 160, 1998 WL 228121 (1998).

There was a valid contractual relationship between AGA and plaintiffs, and Coleman and CC General had actual knowledge of the relationship. The issue is whether plaintiffs have demonstrated that a genuine issue of material fact exists as to whether Coleman and/or CC General intentionally induced or caused a breach of the terms of the agency relationship between AGA and plaintiffs.

As stated above, Jim Sternberg disclosed AGA's overdue payments on October 4, 1994. Plaintiffs terminated its agency agreements with AGA on November 28, 1994. It is undisputed that sometime thereafter, a majority of the business previously written by AGA with plaintiffs was placed with Midland Risk Insurance Company ("MRIC").

It is the custom and practice in the insurance industry that, in the absence of a contract to the contrary, the agent owns the expirations at the termination of his agency. *See Matter of Estate of Corning*, 108 A.D.2d 96, 488 N.Y.S.2d 477, 481 (N.Y.App.Div. 1985); *See also* Lee R. Russ & Thomas F. Segalla, *Couch on Insurance 3d* § 57:59 (1997). Accordingly, the agent, after the termination of the agency, treats the expirations as an asset. *See* 43 Am.Jur.2d, *Insurance* § 150 (1982).

Plaintiffs assert that the transfer of their book of business was in violation of the agency agreements, and that Coleman and CC General are liable for aiding and abetting the transfer. Specifically, the agency agreements state, with respect to expirations, that:

> In the event of termination of this Agreement, the Agent having promptly accounted for and paid over premiums for which he may be liable, the Agent's records, use and control of expirations shall remain the

property of the Agent and be left in his undisputed possession; otherwise the records, use and control of expirations shall be vested in the Company.

*Exhibit "5A" attached to Appendix to Plaintiffs' Response in Opposition of Coleman's Motion for Summary Judgment,* at 4. This language is in accord with the general rule that the agency's right to expirations is subject to any default in the payment of premiums that is owed to the insurer at the time of termination. 43 Am.Jur.2d, *Insurance* § 150 (1982).

Coleman asserts that he did not know that AGA was not remitting all of plaintiffs' premiums until Jim Sternberg's disclosure in October of 1994. Furthermore, Coleman contends that after Sternberg's disclosure, Welch explained to him that AGA was entitled to certain set-offs against the balance of the premiums owed, and, thus, AGA did not owe the entire amount alleged. Coleman points to the letter Welch sent Claus Dannasch, plaintiffs' president, on November 9, 1994, stating his position that plaintiffs owed AGA approximately $1 million for the start up costs of CUIC, and, thus, when that amount was netted against the past due premiums, AGA only owed plaintiffs approximately $60,000.[7] *See Exhibit "2" attached to Coleman's Exhibit "I."*

Welch asserts that after plaintiffs terminated the agency agreements in November of 1994, he directed Coleman to place insureds previously insured with CIC with other insurers. Welch contends that he was entitled to transfer plaintiffs' book of business because he did not believe that he owed plaintiffs any premiums. Coleman asserts that when he assisted in transferring plaintiffs' book of business to MRIC, he was merely following the orders of Welch.

We have already determined that a genuine issue of material fact exists as to whether Coleman knew that Welch was failing to make all of the premiums payments to plaintiffs. Thus, a factual issue exists as to whether Coleman knew when he assisted in transferring plaintiffs' book of business to MRIC that the book of business actually belonged to plaintiffs under the terms of the

agency agreements. Thus, a genuine issue of material fact exists as to whether Coleman intentionally interfered with AGA and plaintiffs' agency agreements. Therefore, Coleman is not entitled to summary judgment on plaintiffs' contractual interference claim. We now turn to the issue of whether CC General can be held liable for aiding and abetting the transfer of plaintiffs' book of business.

█ CC General asserts that it cannot be held liable for the transfer of the book of business because it was not in existence at the time the book of business was transferred to MRIC. Specifically, CC General contends that by the time its articles of incorporation were filed, the book of business was already transferred to MRIC.

On January 31, 1996, the Arkansas Insurance Department suspended AGA's license. On February 7, 1996, the jury rendered its verdict in the previous lawsuit filed by plaintiffs against AGA. Coleman stated in his deposition that after the verdict, it became evident to him that AGA was not going to be able to continue to operate, and, thus, he began discussing forming CC General with Welch and Carolyn Jean Cooper. *See Exhibit "7" attached to Appendix to Plaintiffs' Response in Opposition to Coleman's Motion for Summary Judgment,* at 42–43.

CC General contends that after AGA's suspension, several of the insurers that had contracted with AGA contacted Cooper about servicing their policies. Cooper and Coleman contacted the Arkansas Insurance Department to determine if they could form another company to service existing policies written by AGA.

Coleman asserts that he and David Powell, AGA's attorney, contacted Robert Ridgeway, Jr., the Assistant Commissioner of Insurance, on February 7, 1996. Coleman asserts that during the conversation, Ridgeway stated that he did not see any problems with Cooper and Coleman forming a company to service the policies formerly contracted to AGA as long as the new company was not just a shadow for AGA.

---

7. Welch continues to maintain that Jim Sternberg authorized these costs and that such costs

should have been netted against the premiums owed by AGA to plaintiffs.

On February 12, 1996, CC General filed its articles of incorporation with the Secretary of State of Arkansas. Coleman and Cooper are the sole shareholders of CC General. Coleman is President and Cooper is Vice–President. CC General is comprised of mostly ex-AGA employees. Coleman asserts that neither Welch nor AGA have received any benefits from the formation of CC General. CC General contends that at this point, the book of business had already been transferred to MRIC, and thus, under Arkansas law,[8] the book of business was property of MRIC. Therefore, CC General asserts that in cannot be held liable for aiding and abetting the transfer as it had already occurred.

It is undisputed, however, that Coleman and Cooper assisted MRIC during the "transition stage" of transferring AGA's book of business previously written for plaintiffs. *CC General's Brief in Support of its Motion for Rule 11 Sanctions,* at 2. Indeed, MRIC demonstrated its appreciation by paying CC General's payroll from February 1, 1996, to March 31, 1996, to allow CC General to get its cash flow started. In addition, CC General admits that it took over a small portion of the book of business previously written by AGA for plaintiffs.

Plaintiffs contend that CC General is liable because it knew that upon termination of AGA's agency agreement, if AGA had not remitted the full amount of the premiums due, the book of business written by AGA for plaintiffs vested in plaintiffs. Plaintiffs contend that CC General had no right to service or assist another insurance agency to service the books of business that vested with plaintiffs at the time of termination. Plaintiffs assert that Coleman and Cooper were put on notice at least in 1994, when the agency

agreements were terminated, that plaintiffs were claiming that AGA had defaulted in paying premiums, and, thus, they knew in 1996, when they formed CC General that plaintiffs claimed an interest in the book of business previously written by AGA for plaintiffs.

As stated above, the third element of contractual interference is the requirement of an intentional interference inducing or causing a breach or termination of the relationship. To be liable under contractual interference, plaintiffs must show that CC General intentionally interfered with the agency agreements between AGA and plaintiffs. *See City Nat. Bank of Fort Smith v. Unique Structures, Inc.,* 929 F.2d 1308, 1316 (8th Cir. 1991).

> The *Restatement (Second) of Torts* explains that the tort of interference with contractual relations is similar to other intentional torts "in the sense that the defendant must have either desired to bring about the harm to the plaintiff or have known that this result was substantially certain to be produced by his conduct."

*Id.* (quoting *Restatement (Second) of Torts* Ch. 37, at 5 (1977) (introductory note on the chapter for interference with contract or prospective contractual relation)).

We conclude that a genuine issue of material fact exists as to whether CC General intentionally interfered with plaintiffs' and AGA's agency relationship by assisting in the transfer of plaintiffs' book of business. Therefore, CC General is not entitled to summary judgment.

We note that Coleman asserts that plaintiffs' claim that he aided and abetted in the

---

**8.** Arkansas Code Annotated § 23–64–217 (Supp. 1997) provides in relevant part that:

(a) Upon the suspension or revocation of a license, the commissioner shall immediately notify the licensee of the suspension or revocation either in person or by mail addressed to the licensee at his address last of record with the commissioner.

(1) Notice by mail shall be deemed effectuated when so mailed.

(2) The commissioner shall give like notice to the insurers represented by the agent in the case of an agent's license. Where the license has been revoked, each such insurer represent-

ed by the agent shall, upon receipt of notice from the commissioner, take appropriate and prompt action necessary to:

(A) Retrieve from the agent all solicitation materials, policy applications, binders, and any and all other materials in the possession of the agent which are the property of such insurer; and

(B) Retrieve the agent's policyholder files and records for policies in force at the time such insurer receives notice of the revocation.

\* \* \* \* \* \*

transfer of the book of business is barred by res judicata and/or claim preclusion. Specifically, Coleman contends that plaintiffs did not assert such a claim in the previous lawsuits against Welch and AGA, and, thus, the claim is barred.

The Arkansas Supreme Court has held that res judicata bars relitigation of a subsequent suit when "(1) the first suit resulted in a final judgment on the merits, (2) the first suit was based upon proper jurisdiction, (3) the first suit was fully contested in good faith, (4) both suits involve the same claim or cause of action, and (5) both suits involve the same parties or their privies." *Hamilton v. Arkansas Pollution Control & Ecology Comm.,* 333 Ark. 370, 1998 WL 270017 *1 (1998). It is clear that this suit does not involve the same parties as the previous lawsuit against Welch and AGA, and, thus, res judicata does not bar plaintiffs' claims against Coleman.

The elements of collateral estoppel, or issue preclusion, require that: "(1) the issue is the same as that involved in a prior litigation; (2) the issue was actually litigated; (3) the issue was determined by a valid and final judgment; and (4) the determination was essential to the judgment." *National Farmers Union Standard Ins. Co. v. Morgan,* 966 F.2d 1250, 1253 (8th Cir.1992) (*citing East Texas Motor Freight Lines v. Freeman,* 289 Ark. 539, 713 S.W.2d 456, 459 (1986)). In addition, "Arkansas appears to have followed the general trend away from the requirement of mutuality in collateral estoppel: where the party sought to be estopped had an incentive and a full and fair opportunity to litigate the issue in the prior case, strict identity of parties is not required." *Id. See also Fisher v. Jones,* 311 Ark. 450, 456, 844 S.W.2d 954 (1993).

The doctrine of collateral estoppel is based on the policy of limiting litigation to one fair trial on an issue and is applicable only when the party against whom the decision is being asserted had a full and fair opportunity to litigate the issue in question in the previous trial. *See Coleman's Serv. Center, Inc. supra,* 55 Ark.App. at 291, 935 S.W.2d at 298. Furthermore, the party asserting collateral estoppel has the burden of demonstrating that the precise issue on which it claims the other party is bound was determined in the previous case. *See Smith v. Roane,* 284 Ark. 568, 570, 683 S.W.2d 935, 936 (1985).

We do not believe that collateral estoppel is applicable to the present facts. First, there can be no dispute that the issue of whether plaintiffs' book of business was improperly transferred to MRIC was not litigated in the previous lawsuits. Second, the issue was not essential to the final judgment in either case. In other words, it was not necessary for the jury to determine the issue in order to arrive at their verdict. Therefore, we conclude that Coleman is not entitled to summary judgment based on the theory of res judicata or collateral estoppel.

### C. CC General's Motion for Sanctions

CC General asserts that plaintiffs and their attorneys violated Rule 11(b) by bringing this case against CC General knowing that there was no evidence that supported their claims against CC General. CC General contends that plaintiffs named CC General as a defendant in this lawsuit to harass it and cause it to suffer losses in its business.

Rule 11 requires all parties who file a complaint to represent to the court that:
> to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances, (1) it is not being presented for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation; (2) the claims ... are warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law ...; (3) the allegations and other factual contentions have evidentiary support ...; and (4) the denials of factual contentions are warranted on the evidence....

Fed.R.Civ.P. 11(b).

"The rule allows a district court to impose an 'appropriate sanction' when a party files a complaint in derogation of this responsibility." *Chandler v. Norwest Bank Minnesota, Nat. Ass'n,* 137 F.3d 1053, 1057 (8th Cir. 1998) (*quoting* Fed.R.Civ.Proc. 11).

The imposition of sanctions under Rule 11 is discretionary with the district court, how-

ever, the advisory committee notes provide several factors for the court to consider in determining whether to impose sanctions, or what sanction to impose:

> [w]hether the improper conduct was willful, or negligent; whether it was part of a pattern of activity, or an isolated event; whether it infected the entire pleading, or only one particular count or defense; whether the person has engaged in similar conduct in other litigation; whether it was intended to injure; what effect it had on the litigation process in time or expense; whether the responsible person is trained in the law; what amount, given the financial resources of the responsible person, is needed to deter that person from repetition in the same case; what amount is needed to deter similar activity from other litigants....

Fed.R.Civil P. 11 *advisory committee notes.*

In light of the court's decision to deny CC General's motion for summary judgment on the grounds that a genuine issue of material fact exists as to whether CC General tortiously interfered with plaintiffs and AGA's agency agreements, sanctions against plaintiffs are inappropriate. Therefore, CC General's motion for sanctions will be denied.

## IV. CONCLUSION

Therefore, based on the reasons set forth above, Coleman's motion for summary judgment is granted in part and denied in part, CC General's motion for summary judgment is denied, and CC General's motion for sanctions will be denied. A separate order shall be entered concurrently herewith.