Carl and Doris COBB, as individuals and
next friend of Carla Ann COBB, a minor *v.* INDIAN
SPRINGS, INC., an Arkansas corporation,
James Tillman BABBITT and Danny Lee CREED

74-297                                            522 S.W. 2d 383

Opinion delivered April 28, 1975
[Rehearing denied June 2, 1975.]

*Pierce, Robinson, McCord & Rotenberry; Lamb & Frazier* and
*Richard L. Mattison,* for appellants.

*Laser, Sharp, Hale, Young & Boswell, P.A.,* for appellees.

CARLETON HARRIS, Chief Justice. On the night of October 21, 1972, shortly before or after midnight, Carla Ann Cobb,[1] age 16, was struck by a vehicle driven by Danny Lee Creed, the incident occurring near a bus stop in the Indian Springs Mobile Home Park in Saline County, said park being owned by appellee, Indian Springs, Inc. Earlier in the evening, Miss Cobb had been picked up while walking on a street of the park by James Tillman Babbitt, a security guard employed by the corporation, who subsequently transported her to the bus stop. Babbitt had parked his station wagon completely off the paved roadway on the grass of the shoulder, and was standing near the car when Miss Cobb, also standing by the car, was struck by Creed's automobile, a 1964 Mercury Comet, which he had just purchased. Injuries were sustained by Carla Ann and subsequently Carl and Doris Cobb, her parents, instituted suit individually and as next friend of Carla Ann, seeking damages against Creed, Babbitt, and Indian Springs, Inc., the complaint asserting that the injuries suffered were the proximate result of joint acts of negligence of the three, and that Babbitt, at all pertinent times, was acting in the course and scope of his employment with Indian Springs. Indian Springs and Babbitt answered denying material allegations, other than the fact that Babbitt was an employee of the corporation, but Creed, a minor 16 years of age, was not personally served, though summons was issued, and did not answer. Subsequently, it being called to the attention of the court that Creed was a minor, a guardian ad litem was appointed in his behalf and this guardian filed an answer denying the material allegations of the complaint. Thereafter, the answer by Indian Springs and Babbitt was amended, setting up the defenses of contributory negligence and assumption of risk; a further amendment asserted that the parents of Carla Ann were negligent in failing to exercise ordinary care for the safety of their daughter, alleging that such parents had failed to exercise proper supervision or control, having had the opportunity to do so. The guardian ad litem filed his report, stating that he had notified Creed at his last known address in Hot Springs by certified mail of the pendency of the action and

---

[1] Miss Cobb married subsequent to the filing of the complaint and her surname became Boryschtsck, but she will be referred to throughout this opinion by the name of Cobb.

had enclosed a copy of the complaint; that the letter was returned with the notation, "Moved, left no address." The attorney for appellants executed an affidavit, setting out the steps taken to obtain service on Creed, wherein he stated that a summons had been sent to the sheriff of Garland County showing Creed's last known address in that city, but had been returned "non est", reflecting that the defendant (according to the affiant) had absented himself from the State of Arkansas. Thereafter, according to the affidavit, pursuant to the provisions of Ark. Stat. Ann. § 27-342.2 (Repl. 1962), service was had upon the Secretary of State as agent of service for Creed and notice of the service and a copy of the process were sent by registered mail to Creed at his last known address. Appellees objected to Creed being made a party defendant and after a discussion of the matter in chambers, the trial judge, in open court, announced that he had determined, as a matter of law, that proper service had not been had upon Creed and he was accordingly no longer a party to the litigation. After the submission of proof to the jury on the part of appellants, appellees moved for a directed verdict, which motion the court granted, directing the jury to find for Indian Springs, Inc. and James Tillman Babbitt, the jury so finding. Judgment was accordingly entered and from such judgment, appellants bring this appeal. Two alleged errors are presented, *viz.*, first, that the trial court erred in directing a verdict in favor of appellees, and second, that the trial court erred in excluding Danny Lee Creed as a party to the action.

Ten witnesses testified on behalf of appellants, but only five testified about events relating to the manner in which the accident occurred, *viz.*, Carla Ann Cobb, Stephen Moore, DeWayne Moore, Debbie Steele, and Ronald Anderson, a deputy sheriff of Saline County.

Carla Ann testified that she and a girl friend, on the night in question, went to the park clubhouse where recreation was regularly provided; that her parents told her to be back home by midnight, and that the clubhouse closed at 10:00 P.M.; she and the friend went over to the swings for a while which are located near the clubhouse, then started walking to Arrowhead Road. There, the security guard, Babbitt, picked them up in the park station wagon. She said Bab-

bitt's job included supervision of the young people in the clubhouse and that there was a 10:00 P.M. curfew, i.e., she was not supposed to be out on the streets after that hour. Babbitt mentioned that fact to them, and they got into the car. Several other youngsters were in the car, and they first rode through the trailer park,[2] around through the shopping center, took two of the youngsters home, her friend still being in the car with her, and drove to the bus stop. There they found Debbie and DeWayne. Babbitt talked with these two for a few minutes, and those in the car then left, drove around, Babbitt making further rounds in checking as security officer, and subsequently returned to the bus stop, pulled off in the grass, and stopped. According to Carla Ann, they were two or three feet from the blacktop. Two other boys drove up and asked the two girls to go with them to an eating establishment, but Carla Ann advised that she was to be in at 12 o'clock and could not go. Her friend got in the car with the boys and Carla Ann walked back to Babbitt's car and leaned up against it. She said Danny Creed pulled up in his automobile and engaged in conversation with Babbitt. According to the witness, Babbitt wanted to drive Creed's car but she said the latter refused, stating that, "He just got tags on it that day and he didn't want anybody to drive it." Carla Ann added:

> "Big Jim [Babbitt] told him, 'Well, if you won't let me drive it, take it down to the dairy bar and run it back up here and see what it will do.' He told him, he said, 'I want you to shut it down before you come over that hill because there is a gas line or something.' Some kind of gas pipe and he was scared he would hit them."

Carla Ann testified that Creed then got in his car, turned it around, and drove out of sight; that he then came back up the road, and though she couldn't see him, she could hear him. According to the witness, Babbitt remarked that Creed was "going to hit those gas pipes or kill somebody in the trailers or either himself ***." She said Creed "came over the hill and kept on coming like there wasn't nothing in his way." The witness related that DeWayne Moore ran out in front of

---

[2]Carla Ann mentioned that the young people had ridden with Babbitt before, having requested if they could make his "rounds" with him.

him; Creed slammed on his brakes and the car started "fishtailing"; that she was standing on the grass by the street and thinking Creed was going to "go in front" of the station wagon, started to turn around and run; however, the car driven by Creed "run up the side" of the station wagon and struck her as she turned. Carla Ann stated that the speed limit coming into the park was 25 miles per hour, and the maps reflect speed limits in the park to be 25 and 20 miles per hour.

William Stephen Moore, one of the youngsters who was present when the accident occurred and who had ridden to the bus stop with Danny, testified that Danny drove up to the bus stop and talked with Babbitt about his car.

> "Well, they were just talking about when his car was running real good and he just got it and seen what kind of motor it had in it, a V-8 and four speed and that it ran pretty good. ***

> "Well, we were talking about running cars and how good it would run and how fast it would run through the quarter. What I heard may not be what someone else heard. ***

> "I heard Big Jim ask to see if he could drive his car and Danny said, no he just got it and didn't have no insurance on it and it was the first car he ever had and he didn't feel safe with anybody else driving it. Danny said, 'No.' The next thing I knew Danny was in the car."

As to the accident, Stephen said:

> "Well, we were sitting around there and I didn't hear much conversation and all of a sudden started hearing, you know, tires squealing and the engine roaring and I see him top the hill and my brother DeWayne jumped out there to wave him down so he would slow down and then Danny locked up his brakes and hit Big Jim's car."

Debbie Steele (then Debbie Medlin), who along with Stephen Moore and his brother DeWayne, was with Creed

until reaching the bus stop, testified that she heard Babbitt ask Danny if he could drive the car to which the latter responded, "No", and that somebody said "Go down to the end of the street and see how fast it will run; that Babbitt said, 'Shut it down when you top the hill.'" She was not sure who commented about how fast the car could go, but when asked, to the best of her recollection, who had made the remark, Debbie replied:

> "Well, I can't really say because everybody said that Jim said it. I wasn't watching and I wasn't talking in their crowd. We were standing off talking to Steve Moore and I think Carla was there. They were talking about the car and I couldn't tell who said it and I couldn't tell by voices who said it. I heard somebody say it and I don't know who."

Further, from the record:

> "Q You know how far he [Creed] went down the road?
>
> A Yes. He went to Joe and Ray's Super Market and he turned around in that parking lot and he started from there. I guess at the end of the street is where he started.
>
> Q Did you hear something?
>
> A Squalling tires.
>
> Q Did you hear an accelerated motor?
>
> A Yes, sir.
>
> Q I believe he was out of sight, over the crest of the hill?
>
> A At the bottom of the hill he would have been out of sight but all down the street where he was you could see the car.
>
> Q Did you at some point see it coming back?
>
> A Yes, sir.

Q Was it going fast or slow?

A Fast.

Q What happened then?

A Well, he topped the hill and it didn't look like he was shutting it down and I heard somebody say, 'That's a gas main setting over there.' The street is here and a gas main over there. DeWayne Moore went out in the street and was waving his hands trying to get him to stop. He locked his brakes and swerved to this side. He came back toward the station wagon. I was sitting on the hood in the front. The rest of them were standing in the back. It happened so fast. That is all I can say. He started toward the car and I started backing up on the hood and that is all I could see. Then I heard the crash. I guess I shut my eyes. I don't know."

Dewayne Moore, who had been let out at the bus stop, and was present when the accident occurred, testified that Danny and Babbitt had conversation about Danny's car.

"Well, we drove up and Jim asked how it ran. Danny said, 'All right.' He asked if he could drive Danny's car. Danny said, no because he didn't have any insurance. He asked him to go down there by the store, the dairy bar at Pikewood, turn around and come back and when he got on top of the hill, shut if off. ***

"He said, 'Shut it down on top of the hill' or 'before you get to the hill.'"

Strangely enough, Moore was never asked why he ran out and tried to stop the car.

Deputy Sheriff Ronald Anderson testified that the distance from where Creed stated that he had "locked his brakes", to the point where Carla Ann was struck, reflected that the Creed automobile slid 120 ft. The witness stated that Creed said he had just acquired the car and "he was trying it out." Further:

"I believe I asked him if he seen the girl and he said, 'I was going so fast', he said, 'I seen somebody standing on the road and I tried to swerve' and he said he was sliding and couldn't control his car. ***

"He didn't argue with me or nothing. He told me what he had done. He was sorry for it and all this. He told me wasn't any excuse for that type driving."

We have reached the conclusion that the court erred in directing a verdict. In Restatement of the Law, Torts (1939), § 876, p. 435, we find:

"For harm resulting to a third person from the tortious conduct of another, a person is liable if he

(a) orders or induces such conduct, knowing of the conditions under which the act is done or intending the consequences which ensue, or

(b) knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself, ***"

Comment under Clause (b) is as follows:

"b. Advice or encouragement to act operates as a moral support to a tortfeasor and if the act encouraged is known to be tortious, it has the same effect upon the liability of the adviser as participation or physical assistance. If the encouragement or assistance is a substantial factor in causing the resulting tort, the one giving it is himself a tortfeasor and is responsible for the consequences of the other's act. This is true both where the act done is an intended trespass and where it is merely a negligent act. The rule applies whether or not the other knows his act to be tortious. It likewise applies to a person who knowingly gives substantial aid to another who, as he knows, intends to do a tortious act.

The assistance of or participation by the defendant may be so slight that he is not liable for the act of the

other. In determining this, the nature of the act encouraged, the amount of assistance given by the defendant, his presence or absence at the time of the tort, his relation to the other and his state of mind are all considered."

Let us see how the facts in the case before us comport to the authority just cited. The first important fact is that a jury could certainly find Babbitt initiated, by his words, the sequence of events, or the act (reckless driving) which resulted in the injuries to Carla Ann, i.e., Creed did not suggest that he would like to show everybody what his automobile could do in the way of speed; to the contrary, the suggestion came from Babbitt. A jury could have found that Creed would not have driven the car at a high speed in the Indian Springs area except for the suggestion made, in other words, that Babbitt's encouragement was a *substantial* factor in causing the resulting tort. Since there was testimony that Babbitt told Creed to "run it back up here and see what it will do", a jury could have found that the security guard had suggested that Creed drive the car at his highest speed, through recognizing possible danger by telling Creed to "shut it down before you come over that hill because there is a gas line or something."

Also, the jury might well take into consideration Babbitt's position of authority which possibly could have been a factor influencing Creed to demonstrate the speed of his automobile. This was not a case of one of his fellow students, or young friends, suggesting that he drive the car at high speed, but rather, encouragement from the individual who was in charge of park security, and a person apparently, from the record, held in respect by the young people. Let us use an illustration. A certain high school prohibits operation of a motorcylce on school grounds. A student has a new motorcycle which he would like to show off. Fellow students are on the grounds. Of course, fast driving could be dangerous to those students on the grounds. While the owner, though desiring very much to exhibit the speed of his vehicle, might ignore the suggestion of a fellow student that he proceed, would he not be more inclined to disobey the regulation if one of the teachers suggested that he "show what the motorcycle could do"?

As to foreseeability, it was only necessary that Babbitt, at the time the suggestion was made, foresee an appreciable risk of harm to others. See AMI 2d Ed., § 301, p. 25. The testimony has been fully set out, and we are unwilling to say, under this testimony, as a matter of law, that Babbitt could not foresee injury to Carla Ann.

In the Connecticut case of *Carney* v. *DeWees,* 136 Conn. 256, 70 A. 2d 142, the rationale for imposing liability was the section in Restatement of Torts heretofore set out. There, suit was insituted by an administratrix of a deceased person who was killed when thrown from the body of a truck in which he was a passenger, the truck being in pursuit of a vehicle with which the driver was racing. Prior to the accident, the driver of the lead vehicle, an automobile, had refused, by occupying the left lane and accelerating his car, to permit the other to pass. Judgment was obtained against the driver of the automobile and the Supreme Court of Errors affirmed, holding that the car driver operated his car in a manner that he knew would provoke the truck driver and incite him to attempt to pass, and that as a consequence, the two drivers were participating in a contest of speed. Several other racing cases are cited in the opinion. In the North Carolina case of *Boykin* v. *Bennett,* 118 S.E. 2d 12, the court quoted from Blashfield: Cyclopedia of Automobile Law and Practice, Perm. Ed., Vol. 1, § 761, p. 706.

> "If two or more persons, while racing automobiles upon a public highway in concert, injure another traveler or bystander, they are individually liable for the damage or injury so caused, although only one of the vehicles engaged in the race comes in contact with the injured person or the vehicle in which he is riding."

In the Georgia case of *Landers* v. *French's Ice Cream Company,* 106 S.E. 2d 325, two automobile drivers were racing. A child was struck by one of the automobiles which, at the time, was behind; in fact, the lead car had already passed the child when he was struck by the second vehicle. Suit was instituted against both drivers (as well as the owner of a truck illegally parked along the highway). The lead driver, who was past the point when the accident occurred, demurred to the com-

plaint and the trial court sustained the demurrer. On appeal, the Supreme Court of Georgia reversed, holding that the racing of motor vehicles constitutes negligence and all engaged are liable for an injury sustained to a third person as a result thereof, irrespective of which of the racing cars actually inflict the injury. Several cases in support of the finding are cited, including the Virginia case of *Oppenheimer* v. *Linkous' Adm'x,* 165 S.E. 385, from which the Georgia court quoted as follows:

> "If these men, however, had not been racing Linkous would be alive to-day. His death is directly due to the failure of Oppenheimer's chauffeur to note the passing signal from the Smoot car. (The Smoot car struck Linkous.) He saw fit to invite a race which was not only a proximate cause of the accident but the sole proximate cause."

We recognize that the instant litigation does not involve racing between two individuals, but could not a jury, in considering the facts herein enumerated, come to the conclusion that Creed, encouraged and incited by Babbitt to demonstrate the speed of his car, engaged in the tortious conduct complained of and that Babbitt was thus guilty of negligence? Could not a jury validly find that both Creed and Babbitt were tortfeasors who, by concurrent acts of negligence, though disconnected, were guilty of acts which were the proximate cause of the injuries sustained?

Appellee argues that even if Babbitt were negligent, there was an independent intervening act which was the proximate cause of Carla Ann's injuries but we need not discuss this contention for the matters of intervening cause and foreseeability are questions, under the evidence herein, for a jury to pass upon. We only hold that, under the proof offered, a jury question was presented.

As to the second point, appellees had no standing to raise the issue of whether Creed had been properly served but discussion is unnecessary since the case is being reversed. It may be that Creed can now be served; to say the least, appellants will again have the opportunity to show the steps

taken to obtain service and offer further evidence as to the whereabouts of Creed.

In accordance with what has been said, the judgment is reversed, and the cause remanded for further proceedings not inconsistent with this opinion.

FOGLEMAN, J., concurs.

GEORGE ROSE SMITH, J., dissents.

JOHN A. FOGLEMAN, Justice, concurring. I must concur in the result only because I cannot say from the testimony as abstracted that Babbitt did not owe a duty to Carla Ann Cobb or anyone else who stood alongside the vehicle Babbitt parked on the grass. Appellee appropriately argues the foreseeability test, saying that a very unusual sequence of events produced this injury and that Babbitt could not reasonably foresee this unusual combination, i.e.,

(a) that Danny Creed would disobey his instructions to "shut it off at the top of the hill";

(b) that DeWayne Moore would unexpectedly project himself into the path of the Creed vehicle;

(c) that the Creed vehicle would leave the paved roadway; and

(d) that Carla Cobb, who was completely off the pavement on the grass, was in a place of danger.

When viewed in the light most favorable to the appellant, with all doubts resolved in her favor, it would be difficult to say, as a matter of law, that one in Babbitt's position could not reasonably have foreseen all of these factors. Carla Cobb was between the paved drive and the Babbitt vehicle, which may have been no more than two feet from the edge of the pavement. It is at least debatable that it might have been foreseen that someone would have attempted to flag down the speeding young driver if it appeared that he was "coming like there wasn't nothing in his way" and was about to run into the "gas line where it made a 'T'", which

seems to have been in proximity to the bus stop where Babbitt's vehicle was parked. It was a normal human reaction and not an efficient intervening cause. See *Hartsock* v. *Forsgren, Inc.*, 236 Ark. 167, 365 S.W.2d 117; *Hill* v. *Wilson,* 216 Ark. 179, 224 S.W. 2d 797. And perhaps there might have been reason to foresee that the youth, anxious to show what the first automobile he ever owned would do, might become so exhilarated with the actual high-speed performance of this object of his pride that he would fail to heed the instruction to "shut it down before he came over the hill." The top of the hill also seems to have been in the vicinity of the Babbitt vehicle.

I cannot join in the majority opinion for two reasons. One of them is the injection of the "but for" test through a case from a sister jurisdiction. And then while I can agree with the theory of negligence based upon § 876 of the Restatement of the Law of Torts espoused in the majority opinion, to me the real question on this appeal is the test of negligence by foreseeability, to which I believe the majority concedes this theory of negligence to be subject. However, I agree that this test in this case is not whether Babbitt, or one in his position, should have reasonably foreseen injury to *others,* and that it does turn upon the question whether he should have reasonably foreseen injury to Carla Ann Cobb, or one in her position.

There can be no negligence unless the actor breaches a duty on his part to protect the plaintiff, individually or as as a member of a class or group, from injury. 65 CJS 464, 475, 499, Negligence §§ 2 (1), 4 (1), 4 (10); *Rice* v. *King,* 214 Ark. 813, 218 S.W. 2d 91; *Union Securities Co.* v. *Taylor,* 185 Ark. 737, 48 S.W. 2d 1100.

Duty, however, is not limitless. 65 CJS 486 Negligence § 4 (2). It is limited to the risk reasonably to be foreseen. 65 CJS 486, 488, 520 Negligence §§ 4 (2), 4 (3), § 5 (4). In *St. Louis-San Francisco Ry. Co.* v. *Ward,* 197 Ark. 520, 124 S.W. 2d 975, we quoted from *St. Louis-San Francisco Ry. Co.* v. *Burns,* 186 Ark. 921, 56 S.W. 2d 1027, a clear statement of the rule, i.e.,

. . .the care required is only to provide against such dangers as ought to be foreseen in the light of the attendant circumstances, and the ideal 'prudent person' will therefore not neglect what he can foresee as probable nor divert his attention to the anticipation of events barely possible, but will order his conduct by the measure of what appears likely in the ordinary course of events.

See also, *Dollins* v. *Hartford Accident & Indemity Co.*, 252 Ark. 13, 477 S.W. 2d 179.

In my opinion the appropriate test, insofar as the appellant is concerned is that stated in the oft-cited case of *Palsgraf* v. *Long Island R. Co.*, 248 N.Y. 339, 162 N.E. 99, 59 ALR 1253 (1928). Even when an act constitutes a wrong as to someone else, it is not negligence as to a plaintiff in a personal injury action, if there was no reason to believe that there was any risk of bodily insecurity to the plaintiff. In the opinion in *Palsgraf*, Mr. Justice Cardozo said:

. . . .What the plaintiff must show is "a wrong" to herself, i.e., a violation of her own right, and not merely a wrong to someone else, nor conduct "wrongful" because unsocial, but not "a wrong" to anyone. We are told that one who drives at reckless speed through a crowded city street is guilty of a negligent act, and therefore of a wrongful one, irrespective of the consequences. Negligent the act is, and wrongful in the sense that it is unsocial, but wrongful and unsocial in relation to other travelers only because the eye of vigilance perceives the risk of damage. If the same act were to be committed on a speedway or a race course, it would lose its wrongful quality. The risk reasonably to be perceived defines the duty to be obeyed, and risk imports relation; it is risk to another or to others within the range of apprehension.

. . . .The range of reasonable apprehension is at times a question for the Court, and at times, if varying inferences are possible, a question for the jury.

. . . .One who seeks redress at law does not make out a cause of action by showing without more that there has been damage to his person. If the harm was not willful, he must show that the act as to him had possibilities of danger so many and apparent as to entitle him to be protected against the doing of it though the harm was unintended. Affront to personality is still the keynote of the wrong.

There is a definite trend in this country toward acceptance of the *Palsgraf* rule. Prosser, Law of Torts, 4th Ed., 258, § 43. As a matter of fact, it is the position taken in Restatement of the Law, Torts 2d, § 281, Comment c. There is a very cogent, and perhaps unintentionally favorable, argument for the *Palsgraf* rule in Professor Prosser's comments in his words found at p. 263:

. . . .It is still inconceivable that any defendant should be held liable to infinity for all of the consequences which flow from his act, and some boundary must be set. If nothing more than "common sense" or a "rough sense of justice" is to be relied on, the law becomes to that extent unpredictable, and at the mercy of whatever the court, or even the jury, may decide to do with it.

Although Professor Prosser feels that determination of the question of duty is always one for the court,[1] it seems to me that Justice Cardozo stated the preferable rule in the quotation above. Following it, I must concede that on the record abstracted, there was at least a jury question.

---

[1]Prosser, Law of Torts, 289, § 45.