926 A.2d 859 (2007)
394 N.J. Super. 338
Sevasti PODIAS, Administratrix ad Prosequendum and General Administratrix of the Estate of Antonios N. Podias, Deceased, and Sevasti Podias, Individually, Plaintiff-Appellant,
v.
Michael J. MAIRS, John M. Mairs, Patricia Uribe, Luz R. Crousillat-Uribe, Thomas Chomko, Daniel Chomko and Anne Chomko, Defendants, and
Andrew K. Swanson, Jr. and Kyle Charles Newell, Defendants-Respondents.
Superior Court of New Jersey, Appellate Division.
Argued May 9, 2007.
Decided June 26, 2007.
*861 Jeffrey A. Peck, Florham Park, argued the cause for appellant Sevasti Podias (Drinker, Biddle & Reath, attorneys; Mr. Peck and Jodi Sydell Rosenzweig, on the brief).
Aldo J. Russo, Livingston, argued the cause for respondent Andrew K. Swanson, Jr. (Russo & Della Badia, attorneys; Mr. Russo, on the brief).
Frank P. Menaquale, argued the cause for respondent Kyle Charles Newell (Michael J. Dunn, attorney; Mr. Menaquale, on the brief).
Before Judges LEFELT, PARRILLO and SAPP-PETERSON.
The opinion of the court was delivered by
PARRILLO, J.A.D.
At issue is whether passengers in a car may, in certain circumstances, owe a duty to a pedestrian struck by a driver *862 who is either unwilling or unable to seek emergency aid or assistance himself. Plaintiff Sevasti Podias, Administratrix of the estate of decedent Antonios Podias (Podias), appeals from the summary judgment dismissal of his wrongful death and survivorship action against defendants Andrew K. Swanson, Jr. and Kyle Charles Newell, which concluded that defendants owed decedent no such duty as a matter of law. We now reverse,
We view the facts of record in a light most favorable to the plaintiff. Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540, 666 A.2d 146 (1995). In the evening of September 27, 2002 and early morning hours of September 28, eighteen-year old Michael Mairs was drinking beer at the home of a friend Thomas Chomko. He eventually left with two other friends, defendants Swanson and Newell, both also eighteen years of age, to return to Monmouth University where all three were students. Mairs was driving. Swanson was in the front passenger seat and Newell was seated in the rear of the vehicle where he apparently fell asleep. It was raining and the road was wet.
At approximately 2:00 a.m., while traveling southbound in the center lane of the Garden State Parkway, Mairs lost control of the car, struck a motorcycle driven by Antonios Podias, and went over the guardrail. All three exited the vehicle and "huddled" around the car. Swanson saw Podias lying in the roadway and because he saw no movement and heard no sound, told Mairs and Newell that he thought Mairs had killed the cyclist. At that time, there were no other cars on the road, or witnesses for that matter.
Even though all three had cell phones, no one called for assistance. Instead they argued about whether the car had collided with the motorcycle. And, within minutes of the accident, Mairs called his girlfriend on Newell's cell phone since his was lost when he got out of the car. Swanson also used his cell phone, placing seventeen calls in the next one-and-one-half hours. Twenty-six additional calls were made from Newell's cell phone in the two-and-one-half hours after the accident, the first just three minutes post-accident and to Matawan, where Chomko resides. None of these, however, were emergency assistance calls. As Swanson later explained: "I didn't feel responsible to call the police." And Newell just "didn't want to get in trouble."
After about five or ten minutes, the trio all decided to get back in the car and leave the scene. Swanson directed, "we have to get to an exit." Upon their return to the car, Swanson instructed Mairs "not to bring up his name or involve him in what occurred" and "don't get us [Swanson and Newell] involved, we weren't there." The three then drove south on the parkway for a short distance until Mairs' car broke down. Mairs pulled over and waited in the bushes for his girlfriend to arrive, while Swanson and Newell ran off into the woods, where Newell eventually lost sight of Swanson. Before they deserted him, Swanson again reminded Mairs that "there was no need to get [Swanson and Newell] in trouble . . ." Mairs thought Swanson was "just scared" and that both defendants were concerned about Mairs "drinking and driving." Meanwhile, a motor vehicle operated by Patricia Uribe ran over Podias, who died as a result of injuries sustained in these accidents.
In the ensuing investigation, when State Police located Mairs hours after the accident, Mairs claimed that he was alone in the car. He also denied striking the motorcycle, seemingly unaware of any impact despite being told otherwise by Swanson. At the time, the police officers observed that Mairs "manifested symptoms of alcohol *863 consumption and intoxication." Indeed, when blood was drawn at 5:12 a.m., more than three hours after the accident and well after his last drink at Chomko's house, Mairs' blood alcohol level was .085. It was not until months afterwards that Mairs admitted that defendants were passengers in the car on the evening of the accident and that he had lied to the police because "he was doing what his friends asked him to do." Consequently, when defendants were separately interviewed three months after the accident, they each confirmed the police officers' initial observations. Newell told State Police that Mairs appeared intoxicated from "[t]he way he was acting" and "the odor of his breath." "He had a wobble walk and his speech was slurred a little." Swanson attributed the accident to "[f]irst and foremost, Mike's intoxication." Swanson also claimed that Mairs threatened to leave him at the scene after he told Mairs he had struck the motorcycle and possibly killed the cyclist.
Plaintiff, individually and on behalf of decedent's estate, filed a complaint against several defendants, all of whom save Swanson and Newell, either settled or were found liable after jury trial. Following discovery, defendants Swanson and Newell moved for summary judgment, which the motion judge granted, dismissing plaintiff's complaint with prejudice, finding defendants had no legal duty to volunteer emergency assistance to one whose injury they neither caused nor substantially assisted another in bringing about. As to the latter, the judge reasoned:
I find that the Plaintiff has not established sufficient facts to permit a rational factfinder to resolve any dispute in issue in favor of the Plaintiff concerning the actions of Mr. Newell and Mr. Swanson that would indicate a concert[ed] action. Even assuming that the defendants individually should have known of the duty of Mr. Mairs to call the police, there is absolutely no testimony that either Newell or Swanson encouraged Mairs not to call the police and to leave the scene of the accident or to substantially assist Mr. Mairs in that endeavor. Assistance and encouragement requires active and purposeful conduct in order to be liable under the provisions of the Restatement (Second) of Torts.

Plaintiff appeals, arguing that under the circumstances, defendants owed a duty to decedent which a jury could reasonably find was breached in this instance, and further, under the derivative theory of concert liability, a jury could reasonably find that defendants substantially assisted another in his breach of a direct duty.

(i)
Traditional tort theory emphasizes individual liability, which is to say that each particular defendant who is to be charged with responsibility must be proceeding negligently. Ordinarily, then, mere presence at the commission of the wrong, or failure to object to it, is not enough to charge one with responsibility inasmuch as there is no duty to take affirmative steps to interfere. See W. Page Keeton, et al., Prosser and Keeton on the Law of Torts (Prosser) § 46, at 323-24 (5th ed. 1984). Because of this reluctance to countenance "inaction" as a basis of liability, the common law "has persistently refused to impose on a stranger the moral obligation of common humanity to go to the aid of another human being who is in danger, even if the other is in danger of losing his life." Id. § 56 at 375. Thus, the common law rule imposes "no independent duty of rescue at all" and relieves a bystander from any obligation to provide affirmative aid or emergency assistance, even if the bystander has the ability to *864 help. Praet v. Borough of Sayreville, 218 N.J.Super. 218, 224, 527 A.2d 486 (App. Div.), certif. denied, 108 N.J. 681, 532 A.2d 253 (1987); see also Lundy v. Adamar of New Jersey, Inc., 34 F.3d 1173, 1178 (3d Cir.1994). The underlying rationale for what has come to be known as the "innocent bystander rule" seems to be that by "passive inaction", defendant has made the injured party's situation no worse, and has merely failed to benefit him by interfering in his affairs. Bohlen, The Moral Duty to Aid Others as a Basis of Tort Liability, 56 U. Pa. L.Rev. 217, 220-21 (1908).
Of course, exceptions are as longstanding as the rule. For instance, if one already has a pre-existing legal duty to render assistance, who either by statute or "public calling" has undertaken a duty to give service, then it is that duty which impels him to act, for which omission he may be liable. Praet, supra, 218 N.J.Super. at 224, 527 A.2d 486; see generally Restatement (Second) of Torts §§ 321 to 324A at 132-145 (1965) (1965 Restatement). So too, at common law, those under no pre-existing duty may nevertheless be liable if they choose to volunteer emergency assistance for another but do so negligently. Praet, supra, 218 N.J.Super. at 223-24, 527 A.2d 486; see also 1965 Restatement, supra, § 314 at 116 and § 324 at 142.[1]
Over the years, liability for inaction has been gradually extended still further to a "limited group of relations, in which custom, public sentiment, and views of social policy have led courts to find a duty of affirmative action." Prosser, supra, § 56 at 373-74. Thus, a duty to render assistance may either be "contractual, relational or transactional." Praet, supra, 218 N.J.Super. at 224, 527 A.2d 486. In New Jersey, courts have recognized that the existence of a relationship between the victim and one in a position to provide aid may create a duty to render assistance. Ibid.; see also Lundy, supra, 34 F.3d at 1178. In Szabo v. Pennsylvania R.R. Co., 132 N.J.L. 331, 40 A.2d 562 (E. & A.1945), for instance, the Court held that if the employee, while engaged in the work of his or her employer, sustains an injury rendering him or her helpless to provide for his or her own care, the employer must secure medical care for the employee. Id. at 333, 40 A.2d 562. According to the Court, "[t]his duty arises out of strict necessity and urgent exigency." Ibid.
To establish liability, however, such relationships need not be limited to those where a pre-existing duty exists, or involving economic ties, or dependent on the actor's status as, for instance, a landowner or business owner. Rather, it may only be necessary "to find some definite relation between the parties [] of such a character that social policy justifies the imposition of a duty to act." Prosser, supra, § 56 at 374. So, for instance, the general duty which arises in many relations to take reasonable precautions for the safety of others may include the obligation to exercise control over the conduct of third persons with dangerous propensities. J.S. v. R.T.H., 155 N.J. 330, 714 A.2d 924 (1998); 1965 Restatement §§ 315 and 319; Harper and Kline, The Duty to Control the Conduct of Another, 43 Yale L.J. 886, 898 (1934). In J.S. v. R.T.H., supra, the Court held that when a spouse has actual knowledge or special reason to know of the likelihood of her spouse engaging in sexually abusive behavior against a particular *865 person, the spouse has a duty of care to take reasonable steps to prevent or warn of the harm, and breach of such a duty constitutes a proximate cause of the resultant injury. 155 N.J. at 352, 714 A.2d 924.
So too, even though the defendant may be under no obligation to render assistance himself, he is at least required to take reasonable care that he does not prevent others from giving it. Soldano v. O'Daniels, 141 Cal.App.3d 443, 190 Cal.Rptr. 310 (1983). In other words, there may be liability for interfering with the plaintiff's opportunity of obtaining assistance. And even where the original danger was created by innocent conduct, involving no fault on the part of the defendant, there may be a duty to make a reasonable effort to give assistance and avoid further harm where the prior innocent conduct has created an unreasonable risk of harm to the plaintiff. Hollinbeck v. Downey, 261 Minn. 481, 113 N.W.2d 9 (1962); 1965 Restatement § 321.[2] Indeed, one commentator has suggested that "the mere knowledge of serious peril, threatening death or great bodily harm to another, which an identified defendant might avoid with little inconvenience, creates a sufficient relation to impose a duty of action." Prosser, supra, § 56 at 377.
Actually, the extension of liability based on these and other "relational" features mirrors evolving notions of duty, which are no longer tethered to rigid formalisms or static historical classifications. This progression is not surprising. The assessment of duty necessarily includes an examination of the relationships between and among the parties. J.S. v. R.T.H., supra, 155 N.J. at 338, 714 A.2d 924. The fundamental question is "whether the plaintiff's interests are entitled to legal protection against the defendant's conduct." Ibid. (quoting Weinberg v. Dinger, 106 N.J. 469, 481, 524 A.2d 366 (1987)). In this regard, the determination of the existence of duty is ultimately a question of fairness and public policy, Olivo v. Owens-Illinois, Inc., 186 N.J. 394, 401, 895 A.2d 1143 (2006), which in turn draws upon "notions of fairness, common sense, and morality." Hopkins v. Fox & Lazo Realtors, 132 N.J. 426, 443, 625 A.2d 1110 (1993).
The duty determination, which is a judicial one, Olivo, supra, 186 N.J. at 401, 895 A.2d 1143, involves a complex analysis that weighs and balances several related factors, including
nature of the underlying risk of harm, that is, its foreseeability and severity, the opportunity and ability to exercise care to prevent the harm, the comparative interests of, and the relationships between or among the parties, and, ultimately, based on considerations of public policy and fairness, the societal interest in the proposed solution.
[J.S. v. R.T.H., supra, 155 N.J. at 337, 714 A.2d 924 (citing Hopkins, supra, 132 N.J. at 439, 625 A.2d 1110).]
Specifically, "[f]oreseeability of the risk of harm is the foundational element in the determination of whether a duty exists." J.S. v. R.T.H., supra, 155 N.J. at 337, 714 A.2d 924; Williamson v. Waldman, 150 N.J. 232, 239, 696 A.2d 14 (1997). Foreseeability, in turn, is based on the defendant's knowledge of the risk of injury. *866 Weinberg, supra, 106 N.J. at 484-85, 524 A.2d 366. A corresponding consideration is the practicality of preventing it. J.S. v. R.T.H., supra, 155 N.J. at 339-40, 714 A.2d 924; Clohesy v. Food Circus Supermarkets, Inc., 149 N.J. 496, 516-20, 694 A.2d 1017 (1997); Hopkins, supra, 132 N.J. at 447, 625 A.2d 1110. "When the defendant's actions are `relatively easily corrected' and the harm sought to be presented is `serious,' it is fair to impose a duty." J.S. v. R.T.H., supra, 155 N.J. at 339-40, 714 A.2d 924 (citing Kelly v. Gwinnell, 96 N.J. 538, 549-50, 476 A.2d 1219 (1984)).
Also included in the analysis is "an assessment of the defendant's `responsibility for conditions creating the risk of harm' and an analysis of whether the defendant had sufficient control, opportunity, and ability to have avoided the risk of harm." J.S. v. R.T.H., supra, 155 N.J. at 339, 714 A.2d 924 (citing Kuzmicz v. Ivy Hill Park Apts., Inc., 147 N.J. 510, 515, 688 A.2d 1018 (1997); Carvalho v. Toll Bros. & Developers, 143 N.J. 565, 573, 675 A.2d 209 (1996)). And ultimately, there is public policy, which "must be determined in the context of contemporary circumstances and considerations." J.S. v. R.T.H., supra, 155 N.J. at 339, 714 A.2d 924; see also Kelly, supra, 96 N.J. at 544-45, 476 A.2d 1219 (noting that in a society growing increasingly intolerant of drunken driving, the imposition of a duty on social hosts "seems both fair and fully in accord with the State's policy").
Governed by these principles, we are satisfied that the summary judgment record admits of sufficient facts from which a reasonable jury could find defendants breached a duty which proximately caused the victim's death. In the first place, the risk of harm, even death, to the injured victim lying helpless in the middle of a roadway, from the failure of defendants to summon help or take other precautionary measures was readily and clearly foreseeable. Not only were defendants aware of the risk of harm created by their own inaction, but were in a unique position to know of the risk of harm posed by Mairs' own omission in that regard, as well as Mairs' earlier precipatory conduct in driving after having consumed alcohol. Even absent any encouragement on their part, defendants had special reason to know that Mairs would not himself summon help, but instead illegally depart the scene of a hit-and-run accident, N.J.S.A. 39:4-129; see also N.J.S.A. 39:4-130, either intentionally or because of an inability to fulfill a duty directly owed the victim, thereby further endangering the decedent's safety.
Juxtaposed against the obvious foreseeability of harm is the relative ease with which it could have been prevented. All three individuals had cell phones and in fact used them immediately before and after the accident for their own purposes, rather than to call for emergency assistance for another in need. The ultimate consequence wrought by the harm in this casedeathcame at the expense of failing to take simple precautions at little if any cost or inconvenience to defendants. Indeed, in contrast to Mairs' questionable ability to appreciate the seriousness of the situation, defendants appeared lucid enough to comprehend the severity of the risk and sufficiently in control to help avoid further harm to the victim. In other words, defendants had both the opportunity and ability to help prevent an obviously foreseeable risk of severe and potentially fatal consequence.
In our view, given the circumstances, the imposition of a duty upon defendants does not offend notions of fairness and common decency and is in accord with public policy. As evidenced by the *867 grant of legislative immunity to volunteers afforded by the Good Samaritan Act, N.J.S.A. 2A:62A-1, public policy encourages gratuitous assistance by those who have no legal obligation to render it. Praet, supra, 218 N.J.Super. at 224, 527 A.2d 486. Simply and obviously, defendants here were far more than innocent bystanders or strangers to the event. On the contrary, the instrumentality of injury in this case was operated for a common purpose and the mutual benefit of defendants, and driven by someone they knew to be exhibiting signs of intoxication. Although Mairs clearly created the initial risk, at the very least the evidence reasonably suggests defendants acquiesced in the conditions that may have helped create it and subsequently in those conditions that further endangered the victim's safety. Defendants therefore bear some relationship not only to the primary wrongdoer but to the incident itself. It is this nexus which distinguishes this case from those defined by mere presence on the scene without more, and therefore implicates policy considerations simply not pertinent to the latter.

(ii)
Even assuming no independent duty to take affirmative action, at the very least defendants were obligated, in our view, not to prevent Mairs from exercising his direct duty of care. Soldano, supra, 190 Cal.Rptr. at 315-17. In this regard, traditional tort theory recognizes vicarious liability for concerted tortious action. Prosser, Law of Torts, § 46 at 291 (4th Ed. 1971). Concerted action may be either by agreement (conspiracy) or substantial assistance (aiding and abetting). Id. at 292; Hurley v. Atlantic City Police Dep't, 174 F.3d 95, 127 (3d Cir.1999), cert. denied, 528 U.S. 1074, 120 S.Ct. 786, 145 L.Ed.2d 663 (2000); Halberstam v. Welch, 705 F.2d 472, 477 (D.C.Cir.1983). These two bases of liability correspond generally to the first two subsections in the Restatement (Second) of Torts, § 876 (1979) (1979 Restatement) on "Persons Acting in Concert":
For harm resulting to a third person from the tortious conduct of another, one is subject to liability if he
(a) does a tortious act in concert with the other or pursuant to a common design with him [conspiracy], or
(b) knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself [aiding-abetting], or
(c) gives substantial assistance to the other in accomplishing a tortious result and his own conduct, separately considered, constitutes a breach of duty to the third person.
[Halberstam, supra, 705 F.2d at 477 (quoting Restatement, supra, § 876) (emphasis added).]
Thus, "aiding-abetting" focuses on whether a defendant knowingly gave "substantial assistance" to someone engaged in wrongful conduct, not on whether the defendant agreed to join the wrongful conduct. Halberstam, supra, 705 F.2d at 478.
Of course, how much assistance is substantial enough is fact-sensitive. The 1979 Restatement lists five factors:
the nature of the act encouraged, the amount of assistance given by the defendant, his presence or absence at the time of the tort, his relation to the other [tortfeasor] and his state of mind[.]
[1979 Restatement, supra, § 876(b) comment d.]
See also Tarr v. Ciasulli, 181 N.J. 70, 83-84, 853 A.2d 921 (2004). Additionally, the court in Halberstam provided a sixth factor, the duration of the assistance provided. Halberstam, supra, 705 F.2d at 484.
*868 Vicarious liability does not have to be based on acts of assistance but may rest on inaction, Hurley, supra, 174 F.3d at 126; Monsen v. Consolidated Dressed Beef Co., Inc., 579 F.2d 793, 800 (3d Cir.), cert. denied, 439 U.S. 930, 99 S.Ct. 318, 58 L. Ed.2d 323 (1978), or on words of encouragement. Halberstam, supra, 705 F.2d at 481-82; Landy v. Fed. Deposit Ins. Corp., 486 F.2d 139, 163 (3d Cir.1973), cert. denied, 416 U.S. 960, 94 S.Ct. 1979, 40 L.Ed.2d 312 (1974). "Advice or encouragement to act operates as a moral support to a tortfeasor and if the act encouraged is known to be tortious it has the same effect upon the liability of the adviser as participation or physical assistance." 1979 Restatement, supra, § 876(b), comment d. Thus, suggestive words that plant the seeds of or fuel negligent action may be enough to create joint liability. In Rael v. Cadena, 93 N.M. 684, 604 P.2d 822 (Ct.App.1979), the defendant had given verbal encouragement ("Kill him!" and "Hit him more!") to an assailant. The defendant had not physically assisted in the battery. The court explained that liability did not require a finding of action in concert, nor even that the injury had directly resulted from the encouragement. Instead, it found, citing 1979 Restatement § 876(b), that the fact of encouragement was enough to create joint liability for the battery. Mere presence at the scene, it noted, would not be sufficient for liability.
In Cobb v. Indian Springs, Inc., 258 Ark. 9, 522 S.W.2d 383 (1975), a security guard allegedly urged a younger motorist with a new car to "run [the car] back up here and see what it will do." Id. at 387. The driver then struck the plaintiff while trying to avoid a pedestrian during his high-speed "test run." The court held, relying on 1979 Restatement § 876(b), that a jury could have found the guard's encouragement substantial because he had first proposed the trial drive and because his position of authority gave his suggestion extra weight. On the issue of extent of liability, the Cobb court found that the guard could have foreseen an appreciable risk of harm to others at the time of encouragement.
Applying the Restatement's factors to the facts of the summary judgment record viewed most favorably to plaintiff, we conclude a jury may reasonably find defendants' assistance was "substantial." Whether the principal wrongdoer was either impaired or entirely coherent, it is reasonable to infer that at the very least defendants collaborated in, verbally supported, or approved his decision to leave the scene, and at most actively convinced Mairs to flee as a means of not getting caught. The record reasonably admits that defendants feared apprehension. Mairs had just engaged in wrongful conduct causing injury to another under circumstances from which defendants evidently desired to disassociate. Defendants were aware of Mairs' role in the tortious activity and took affirmative steps in the immediate aftermath to conceal their involvement in the event. Indeed, Swanson supposedly told Mairs not to disclose their names and participation and Mairs complied "because he was doing what his friends told him to do." After five or ten minutes of arguing, there was agreement to depart without calling for assistance. Thereafter, Swanson directed Mairs to the nearest parkway exit and when the car broke down, defendants ran into the woods. The entire aftermath of the incident betrays an orchestrated scheme among the three to avoid detection not only by taking no action to prevent further harm to the victim, but by affirmatively abandoning the scene, practically guaranteeing his death. Whether Mairs was especially vulnerable to defendants' pleas because of a mental condition weakened by alcohol *869 or whether he was simply encouraged by defendants' "group" mentality of escaping accountability, a jury could reasonably find on the evidence defendants' assistance substantial enough to justify civil liability vicariously, on an aiding and abetting theory.

(iii)
We formulate today no rule of general application since the question of duty remains one of judicial balancing of the mix of factors peculiar to each case. We also stress the narrowness of the issue before us. As we understand plaintiff's claim, defendants, while riding as passengers in a third person's car, are not liable to another run over by the car even though they may know or have reason to know the driver was unable to operate the vehicle in a reasonably careful and prudent manner. Rather, plaintiff's claim of actionable negligence on the part of defendants is based on their alleged breach of a duty arising thereafter in the accident's aftermath to take emergency action to prevent further harm to the helpless victim. On this score, we mention the original danger created by third party conduct not to suggest defendants' liability therefor, but only insofar as it might have created an unreasonable risk of further harm to the already injured victim, of which defendants were aware and had the opportunity and ability to help prevent, and to illustrate defendants' connection to the entire episode, which, as part of a common undertaking, transcended that of the innocent bystander or uninvolved stranger who is otherwise shielded from liability for failing to summon emergency aid.
It is the degree of defendants' involvement, coupled with the serious peril threatening imminent death to another that might have been avoided with little effort and inconvenience, suggested by the evidence, that in our view creates a sufficient relation to impose a duty of action. Of course, it still remains a question of fact whether the primary wrongdoer was able to exercise reasonable care to summon emergency assistance or was prevented from doing so by defendants; whether, on the other hand, defendants knew or had reason to know that Mairs was unable or unwilling to do so, and thereafter were in a position to have influenced the outcome; whether the decision to abandon the victim was otherwise Mairs' alone or the result of encouragement, cooperation or interference from defendants; and finally, if the latter, whether the assistance was substantial enough to support a finding of liability. The facts here are certainly not such that all reasonable persons must draw the same conclusion. We cannot say that upon any version of the facts there is no duty.
Reversed and remanded.
NOTES
[1] This feature of the common law rule has been abrogated by statute. In New Jersey, the Good Samaritan Act, N.J.S.A. 2A:62A-1, offers immunity from tort liability not just to "health care licensees", L. 1963, c. 140, but to "any individual" who renders emergency assistance. L. 1968, c. 254, § 1.
[2] In New Jersey, the hit-and-run driver statute, N.J.S.A. 39:4-129(a), imposes a duty on a driver regardless of fault, to remain at or return to the scene of the accident. Moreover, if a party is injured and no police officer is present, the driver "shall forthwith report such accident to the nearest . . . police department". N.J.S.A. 39:4-129(c). See also State v. Saulina, 177 N.J.Super. 264, 268-69, 426 A.2d 513 (App.Div.1980); Fuentes v. Reilly, 590 F.2d 509 (3d Cir.1979).